**FILED**

FEB - 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRANK J. LAWRENCE, JR.                          )     VERIFIED
941 Westview Rd.                                )     COMPLAINT FOR
Bloomfield Hills, MI  48304                     )     DECLARATORY
(248) 722-2560,                                 )     RELIEF AND
                                                )     DAMAGES
        Plaintiff,                              )
                                                )
        v.                                      )     Civil No:_____
                                                )
MARK S. CARLIN, in his official capacity as     )
Chairman of the Committee on Admissions,        )
1900 M St., N.W., Ste. 601                       `
Washington, D.C., 20036-3519;

ALAN H. KENT, in his individual capacity,
1747 Pennsylvania Avenue, N.W., Ste. 300
Washington, D.C., 20006; and

THREE UNKNOWN INVESTIGATORS OF THE              )
COMMITTEE ON ADMISSIONS, in their               )
individual capacities,                          )
                                                )
        Defendants.                             )
_____ )

CASE NUMBER  1:07CV00288

JUDGE: Royce C. Lamberth

DECK TYPE: Civil Rights (non-employm

DATE STAMP: 02/**/2007

## VERIFIED COMPLAINT

Introductory Statement

On May 16, 2006, Plaintiff Frank J. Lawrence, Jr., a resident of Michigan, applied for a

license to practice law in the District of Columbia and Plaintiff thereafter passed the July, 2006,

District of Columbia Bar Examination.   While Plaintiff's application was pending in the District

of Columbia, he filed a civil rights lawsuit though his counsel against the Michigan Board of

Law Examiners, in the United States District Court for the Western District of Michigan.   That

action is presently on appeal in the United States Court of Appeals for the Sixth Circuit

(Lawrence v. Berry, 6th Cir. No. 07-1026).   After Plaintiff filed his Michigan civil rights lawsuit,

the District of Columbia Committee on Admissions advised Plaintiff that his application for a

license to practice law in the District of Columbia would be held in abeyance pending the conclusion of Plaintiff's federal civil rights litigation against the Michigan attorney licensing officials.

This lawsuit seeks a declaration from this Court that Defendant Mark S. Carlin's refusal to further process Plaintiff's application for a license to practice law, until Plaintiff concludes his pending litigation against Michigan licensing officials, violates Plaintiff's rights under the First, Fifth and Fourteenth Amendments to the Constitution of the United States. Plaintiff also seeks a declaration that the length of time that his application has been pending in the District of Columbia (9 months) without a decision is unreasonable and violates due process of law. Additionally, Plaintiff seeks damages from "Three Unknown Investigators" of the Committee on Admissions, in their individual capacities, who have performed investigative functions. Finally, Plaintiff seeks damages from Alan H. Kent, the Committee on Admissions' legal counsel who, upon information and belief, provided unconstitutional legal advice to Defendant Carlin and the Defendants collectively referred herein as "Three Unknown Investigators". See, e.g., Burns v. Reed, 500 U.S. 478, 496; 111 S. Ct. 1934; 114 L. Ed. 2d 547 (1991) (attorneys are not entitled to absolute immunity for the act of giving unconstitutional legal advice).

## JURISDICTION

1.    Plaintiff seeks to vindicate rights protected by the First, Fifth and Fourteenth Amendments to the Constitution of the United States and by 42 U.S.C. §1983[1]. This court has jurisdiction over this civil action pursuant to 28 U.S.C. §1331 and §1343(a)(3) and (4). Plaintiff seeks declaratory relief pursuant to §2201 and §2202.

---

[1] To the extent that Plaintiff's Michigan residency affords him the protections of the Fourteenth Amendment, he hereby gives notice that this lawsuit is also brought to enforce rights protected by the Fourteenth Amendment to the Constitution of the United States.

VENUE

2.     The principal place of business of the Committee on Admission (hereinafter "Committee") is in the District of Columbia.  Pursuant to 28 U.S.C. 1391(b), venue is proper in the United States District Court for the District of Columbia.

PARTIES

3.     Plaintiff Frank J. Lawrence, Jr. is a resident of Bloomfield Hills, Michigan.  He is 33 years old, holds the degree of Juris Doctor from an accredited Michigan law school and has a Bachelor's degree in Business Administration from the University of Michigan.  On May 16, 2006, Plaintiff filed his application for a license to practice law in the District of Columbia, and Plaintiff thereafter passed the July, 2006, District of Columbia Bar Examination.  Plaintiff is actively seeking a license to practice law in the District of Columbia.

4.     Defendant Mark S. Carlin is the Chairman of the District of Columbia Court of Appeals Committee on Admissions.  The District of Columbia Court of Appeals is authorized "to make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar and their censure, suspension, and expulsion." D.C. Code § 11-2501(a); Thomas v. Knight, 257 F. Supp. 2d 86, 89 (D.C. Cir. 2003).  Pursuant to this authority, the District of Columbia Court of Appeals created the Committee and granted it the administrative power and duty to investigate applicants for a license to practice law and to prepare and forward its own findings and recommendations to the District of Columbia Court of Appeals.  At all times relevant hereto, Defendant Carlin was acting under color of laws enacted by the District of Columbia. Defendant Carlin is sued in his official capacity.

5.     Defendants "Three Unknown Investigators" are agents of the Committee who perform investigative functions.  These individuals "perform[] the investigative functions normally

3

performed by a detective or police officer" such as "searching for the clues and corroboration that might give [them] probable cause" to recommend an adverse licensing decision during the subsequent adjudicative phase of an applicant's application process. Because these defendants are being sued in their investigative capacities, they are entitled, at most, to qualified immunity. Buckley v. Fitzsimmons, 509 U.S. 259, 273; 113 S. Ct. 2606; 125 L. Ed. 2d 209 (1993). At all times relevant hereto, Defendants "Three Unknown Investigators" were acting under color of laws enacted by the District of Columbia. These Defendants are sued in their individual capacities.

6.      Defendant Alan J. Kent is the Committee's Bar Admissions Counsel who, while acting under color of laws enacted by the District of Columbia, provides legal advice to agents of the Committee. Attorneys who provide unconstitutional legal advice to investigators are not entitled to absolute immunity from suit. See, e.g., Burns v. Reed, 500 U.S. 478, 496; 111 S. Ct. 1934; 114 L. Ed. 2d 547 (1991). Defendant Kent is sued in his individual capacity.

## GENERAL ALLEGATIONS

A.      Character Review

7.      The District of Columbia Court of Appeals regulates the practice of law by requiring a license as a condition of practice. An applicant for a law license must meet certain eligibility requirements, which are divided generally between integrity fitness (evaluated by review of "good moral character") and education fitness (evaluated by written examination of familiarity with standard legal concepts). The Committee, through Defendant Carlin, is charged with the responsibility of evaluating applications for admission to the practice of law in the District of Columbia.

8.    The Rules of the District of Columbia Court of Appeals give the Court of Appeals final administrative decision-making authority over the assessment of "good moral character". However, the Committee first conducts an investigation and formulates a recommendation concerning an applicant's character, which is then transmitted to the Court of Appeals.

9.    The "character" review of an applicant for membership in the District of Columbia starts when an applicant files an application for admission. At all times during the application process, an applicant is in control over whether his application remains pending or not. The applicant may withdraw from the process and the applicant has the option of requesting a hearing before the Committee. As such, application proceedings in the District of Columbia are remedial and/or non-coercive, unlike the criminal proceedings in Younger v. Harris, 401 U.S. 37, 27 L. Ed. 2d 669, 91 S. Ct. 746 (1971), or the disciplinary proceedings in Middlesex County Ethics Cornm. v. Garden State Bar Ass'n, 457 U.S. 423, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (1982). Also, the Applicant bears the burden of proof during his licensing process. Therefore, even if there were ongoing state proceedings in this matter (by contrast, here the state proceedings are "in abeyance"), there would be no basis for abstention in this matter. O'Neill v. City of Philadelphia, 32 F.3d 785, 791 n.13 (3rd Cir. 1994); Exec. Art Studio. Inc. v. City of Grand Rapids, 179 F. Supp. 2d 755, 759 (W.D. Mich. 2001) ("Thus, where the federal plaintiff also initiates the state proceeding, the basis for Younger abstention will usually be absent because the state is not seeking to enforce its laws."); Torres v. Carrion, 376 F. Supp. 2d 209, 213 (D.P.R. 2005).

10.    In determining the moral character and general fitness of an applicant for admission to the Bar, the Committee may act without requiring the applicant to appear before it to be sworn and interrogated. If the Committee is unwilling to certify an applicant, it shall notify the

applicant of the choice of withdrawing the application or requesting a hearing. Rule 46(f)(1), Rules of the District of Columbia Court of Appeals (hereinafter "DCCA Rules").

11. Within 30 days from the date of the notice, an applicant may file with the Committee a written request for a hearing. If an applicant fails to file a timely request for a hearing, the applicant's application shall be deemed withdrawn. If an applicant requests a hearing within the 30-day period, the request shall be granted and the Committee will conduct a hearing. DCCA Rule 46(f)(1).

12. Following a formal hearing on an applicant's good moral character, the Committee delivers a report of its findings and conclusions to the District of Columbia Court of Appeals. DCCA Rule 46(g)(1). After receipt of a Committee report, if the District of Columbia Court of Appeals proposes to deny admission, the Court issues an order to the applicant to show cause why the application should not be denied. Proceedings are thereafter heard by the Court on the record made by the Committee. DCCA Rule 46(g)(2).

13. Except for the review by the District of Columbia Court of Appeals provided above, no other review by the Court of actions by or proceedings before the Committee are permitted except upon a showing (1) of extraordinary circumstances for instituting such review and (2) that an application for relief has previously been made in the first instance to the Committee and been denied by the Committee, or that an application to the Committee for the relief is not practicable. DCCA Rule 46(g)(3)

14. Because an applicant for a license to practice law in the District of Columbia cannot invoke judicial review to challenge an administrative decision of the Committee unless "extraordinary circumstances" exist (prior to a final administrative decision of the Committee),

DCCA Rule 46(g)(3), an applicant is left without an adequate state remedy to challenge unconstitutional investigative action by the Committee and its agents.

15.    The DCCA Rules do not provide for time limits on administrative investigations by the Committee. Also, the DCCA Rules do not provide for substantive or procedural limitations on Defendants' investigative functions or the exercise of administrative discretion. In Plaintiff's case, his application for a license to practice law has been pending with the Committee for 9 months.

B.    Allegations Concerning Plaintiff

16.    On or about May 16, 2006, Plaintiff filed with the Committee his application for a license to practice law in the District of Columbia. In doing so, Plaintiff filed an affidavit of personal history, which is required of all licensing applicants. An affidavit of personal history is an exhaustive list of an applicant's life's activities that the Committee uses to investigate an applicant's moral character and fitness to practice law. Plaintiff also tendered all applicable filing fees to the Committee.

17.    The Committee accepted Plaintiff's application for a license to practice law, Plaintiff's affidavit of personal history and his application fees. The Committee then notified Plaintiff that he was scheduled to attend and take the July 25th and 26th District of Columbia Bar Examination.

18.    Plaintiff took the July 25th and 26th District of Columbia Bar Examination and he received a passing score on it. By virtue of Plaintiff's passing Bar Exam score, the Committee and Defendants have no present reason to question Plaintiff's educational fitness to practice law in the District of Columbia.

19.    On June 22, 2006, Plaintiff was notified by the Michigan Board of Law Examiners, in a final administrative decision, that his application for a license to practice law in the State of

7

Michigan was denied. Specifically, Plaintiff was denied because the Michigan Board of Law Examiners felt that Plaintiff's public criticism of two Michigan "character and fitness" investigators was inappropriate [Exhibit 1, Opinion of the Michigan Board of Law Examiners]. On September 8, 2006, Plaintiff filed suit in the United States District Court for the Western District of Michigan against, *inter alia*, the President of the Michigan Board of Law Examiners, seeking relief similar to that authorized by Dubuc v. Mich. Bd. of Law Examiners, 342 F.3d 610 (6th Cir. 2003). Plaintiff was (and is) represented by counsel in that litigation.

20.    On December 14, 2006, the United States District Court for the Western District of Michigan dismissed Plaintiff's civil rights action. Lawrence v. Berry, 2006 U.S. Dist. LEXIS 90283 (W.D. Mich. 2006). On December 15, 2006, Plaintiff filed a notice of appeal to the United States Court of Appeals for the Sixth Circuit. Lawrence v. Berry, Sixth Circuit No. 07-1026. The Sixth Circuit Court of Appeals has entered a briefing schedule and the parties are presently briefing the appeal [Exhibit 2, Plaintiff's Brief in the Sixth Circuit Court of Appeals].

21.    The Committee requires licensing applicants to inform the Committee of any pending civil litigation in which an applicant is involved. Pursuant to this obligation, Plaintiff apprised the Committee that he had brought a civil rights action against the Michigan Board of Law Examiners and Plaintiff has kept the Committee abreast of the developments in that litigation.

22.    On December 26, 2006, Plaintiff sent a letter to the Committee, which requested that the Committee either certify him for admission or provide Plaintiff a hearing on or before January 26, 2007. The Committee refused to do either. On January 24, 2007, the Committee informed Plaintiff by letter, *inter alia*, that the Committee on Admissions would hold Plaintiff's application in abeyance pending the conclusion of Plaintiff's litigation against the Michigan Board of Law Examiners.

23.    Plaintiff's litigation against the Michigan Board of Law Examiners is likely to last for years.  Unless the Sixth Circuit Court of Appeals enters an order expediting briefing and submission to an appellate panel, an appeal on average takes between 12 to 18 months for an appellate decision.  If the case is remanded for trial, the conclusion of the proceedings will take much longer.  For example, when E. Stephen Dean sued (former) Michigan Character and Fitness Regulation Counsel Thomas Byerley for wrongfully threatening Mr. Dean with character rejection, it took over 4 years to fully adjudicate that case through trial.  See, Dean v. Byerley, 354 F.3d 540 (6th Cir. 2004).

24.    The DCCA Rules do not authorize Defendants Carlin and "Three Unknown Investigators" to hold "in abeyance" Plaintiff's application for a license to practice law until he concludes federal civil rights litigation against Michigan licensing officials.  There is no rational basis for the Defendants' actions and Plaintiff has suffered, and continues to suffer, injuries of constitutional dimension as a result of Defendants' conduct.

25.    The relief requested in this lawsuit would not create an undue interference with any ongoing Committee proceedings because the primary purpose of this litigation is equitable relief that would compel Defendants to cease holding in abeyance Plaintiff's application process.

### COUNT I – DECLARATORY RELIEF
### - FIRST, FIFTH AND FOURTEENTH AMENDMENTS -
### (Defendant: Carlin, in his official capacity)

26.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 25, as though fully set forth herein.

### First Amendment Claims

27.     Whatever important interest the District of Columbia may have in regulating its own Bar,

it does not outweigh the "equally important" and strong federal substantive interest in protecting

Bar applicants from First Amendment violations.  The Supreme Court has stated:

> We recognize the importance of leaving States free to select their own bars,
> but it is equally important that the State not exercise this power in an
> arbitrary or discriminatory manner nor in such way as to impinge on the
> freedom of political expression or association. A bar composed of lawyers
> of good character is a worthy objective but it is unnecessary to sacrifice vital
> freedoms in order to obtain that goal. It is also important both to society and
> the bar itself that lawyers be unintimidated -- free to think, speak, and act as
> members of an Independent Bar.

Koninsberg v. State Bar of California, 353 U.S. 252, 273; 77 S. Ct. 722; 1 L. Ed. 2d 810 (1957)
(emphasis added)

28.     Plaintiff has a clearly established federal right to file a civil rights lawsuit against the

Michigan licensing officials.  Defendants' conduct of holding Plaintiff's application in abeyance

burdens Plaintiff's First Amendment right to petition the federal courts for redress of grievances.

The right to initiate civil litigation is a First Amendment right, Bill Johnson's Restaurants, Inc. v

N.R.L.B., 461 U.S. 731, 741; 103 S. Ct. 2161; 76 L. Ed. 2d 277 (1983), and the right to subject

government action to constitutional scrutiny "implicates central First Amendment concerns."

Legal Services Corp. v Velazquez, 531 U.S. 533, 547, 149 L. Ed. 2d 63, 121 S.Ct. 1043 (2001).

By holding Plaintiff's District of Columbia application for a license "in abeyance" until Plaintiff

concludes his litigation against Michigan licensing officials, Defendant Carlin's practices have

chilled Plaintiff's rights and they would cause a person of ordinary firmness to cease engaging in

federally secured activities, namely, litigate important and cherished constitutional interests.

29.     Because Defendants use an applicant's decision to file a lawsuit against another state's

licensing officials as a basis to hold in abeyance the application process in the District of

Columbia, Defendants' practices also violate the rule of <u>Perry v. Sindermann</u>, 408 U.S. 593, 597;

33 L. Ed. 2d 570; 92 S. Ct. 2694 (1972), which states:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Speiser v. Randall, 357 U.S. 513, 526. Such interference with constitutional rights is impermissible.

30.     An applicant for licensing by the District of Columbia, whether in the realm of the legal

profession, the medical profession or the plumbing profession, cannot be denied a license

because he or she has exercised First Amendment rights, defended past protected expression, or

challenged unlawful or questionable governmental conduct.  The Supreme Court has described

the right to petition government for redress of grievances as "among the most precious of the

liberties safeguarded by the Bill of Rights." <u>United Mine Workers v. Illinois State Bar Ass'n</u>, 389

U.S. 217, 222, 19 L. Ed. 2d 426, 88 S. Ct. 353 (1967).

31.     Defendants' decision to hold in abeyance Plaintiff's application additionally violates the

unconstitutional condition doctrine because approval is linked (implicitly if not explicitly) to

whether the Defendants subjectively agree with the content of an applicant's protected

expression in a civil rights lawsuit.  The Defendants' practices violate the First Amendment.

Due Process Claims

32.     A person's opportunity to pursue a career is a fundamental liberty interest, which is

protected by due process and equal protection. <u>See</u> <u>Trifax Corp. v. District of Columbia</u>, 314

F.3d 641, 643 (D.C. Cir. 2003); <u>Willner v. Committee on Character and Fitness</u>, 373 U.S. 96,

11

102-03, 10 L. Ed. 2d 224, 83 S. Ct. 1175 (1963); <u>Schware v. Board of Bar Examiners</u>, 353 U.S. 232, 238-39, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957).

33.    A state cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the due process or equal protection clauses of the Fourteenth Amendment. <u>Willner v. Committee on Character & Fitness</u>, 373 U.S. 96, 102; 83 S. Ct. 1175; 10 L. Ed. 2d 224 (1963). The full protection of the Fourteenth Amendment has been extended to the District of Columbia through the Fifth Amendment's Due Process Clause. <u>See</u> <u>Bolling v. Sharpe</u>, 347 U.S. 497, 499; 74 S. Ct. 693; 98 L. Ed. 884 (1954).

34.    Defendants' practices alleged herein are conducted in a manner and for reasons that contravene the due process clause (both substantive and procedural due process of law). Plaintiff is being subjected to arbitrary administrative practices and Defendants are punishing him for exercising his constitutional right to file a lawsuit. It is a violation of due process to punish a person for asserting a protected statutory or constitutional right. <u>North Carolina v Pearce</u>, 395 U.S. 711; 89 S. Ct. 2072; 23 L. Ed. 2d 656 (1969). To punish a person because he has done what the law plainly allows him to do "is a due process violation of the most basic sort." <u>Bordenkircher v Hayes</u>, 434 U.S. 357, 363; 98 S. Ct. 663; 54 L. Ed. 2d 604 (1978).

35.    The Defendants' decision to hold in abeyance Plaintiff's application on account of his complaints about Michigan licensing officials is not rationally related to Plaintiff's ability to practice law in the District of Columbia. For example, in <u>Konigsberg v. State Bar of California</u>, 353 U.S. 252, 268-269; 77 S. Ct. 722; 1 L. Ed. 2d 810 (1957), a bar applicant wrote a series of editorials for a local newspaper where he "severely criticized ... this Court's decisions in <u>Dennis</u> and other cases." <u>Id</u>. at 268. In addressing the bar applicant's "severe" criticism of public

officials, our nation's highest Court stated that an applicant's challenge to, or disagreement with, governmental action is not a rational basis for character rejection:

> We do not believe that an inference of bad moral character can rationally be drawn from these editorials. Because of the very nature of our democracy such expressions of political views must be permitted. Citizens have a right under our constitutional system to criticize government officials and agencies. Courts are not, and should not be, immune to such criticism. Government censorship can no more be reconciled with our national constitutional standard of freedom of speech and press when done in the guise of determining "moral character," than if it should be attempted directly.
> Id. at 269.

Similarly, Defendants' decision to hold in abeyance Plaintiff's District of Columbia application to practice law because Plaintiff has challenged Michigan officials in a federal civil rights lawsuit is patently irrational.

36.    Plaintiff's application for a license to practice law has been pending with the Defendants for an unreasonable amount of time. See, Mathews v. Eldridge, 424 U.S. 319, 330, 342, 96 S.Ct. 893, 900, 906, 47 L.Ed.2d 18 (1976) (characterizing an eleven-month delay in administrative action as "torpid"). While there is "no bright-line rule ... for determining when a delay is so burdensome as to become unconstitutional," Kraebel v. New York City Dept. of Housing Preservation and Development, 959 F.2d 395, 405 (2nd Cir. 1992), the Supreme Court acknowledged as early as 1926 that delay is an element to be considered by courts in evaluating the constitutionality of administrative procedures that affect substantive rights. See, Smith v. Illinois, 270 U.S. 587, 591, 70 L. Ed. 747, 46 S. Ct. 408 (1926).

37.    The Supreme Court has recognized that the length of time of a wrongful deprivation of a benefit is an important factor to be considered in assessing the impact of government action on private interests. Fusari v. Steinberg, 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975) (state unemployment benefits); Steinberg v. Fusari, 364 F.Supp. 922, 937-938 (D.Conn.

1973), vacated and remanded on other grounds, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (a delay of just over 100 days was held to frustrate due process requirements). Given the invalidity of the basis for Defendants' decision to hold Plaintiff's application in abeyance, Defendants' practices violate due process of law.

38.    The absence of time limits on decision-making in the DCCA Rules violates Plaintiff's federal right to procedural and substantive due process of law. By their conduct alleged herein, Defendants have violated Plaintiff's rights through random and unauthorized acts. Defendants have additionally violated Plaintiff's rights through established state procedures. Plaintiff was entitled to a hearing (pre-deprivation and/or post-deprivation) before Defendants denied Plaintiff due process of law by placing his application for a license in abeyance.

Equal Protection Claims

39.    The Equal Protection Clause prohibits states from making distinctions that burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference. By holding Plaintiff's District of Columbia application process "in abeyance" because Plaintiff elected to file a civil rights lawsuit against Michigan officials, Defendants have treated Plaintiff in an arbitrary, capricious and irrational manner. Defendants have singled out Plaintiff and he has been differentially treated as a "class of one" without a rational basis. Village of Willowbrook v. Olech, 528 U. S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000).

40.    Therefore, this Court should declare that Defendant Carlin's decision to hold Plaintiff's application for a license "in abeyance" until Plaintiff concludes his Michigan civil rights litigation impermissibly impinges upon protected federal rights guaranteed to Plaintiff by the Constitution of the United States.

14

## COUNT II – DAMAGES
### - FIRST, FIFTH AND FOURTEENTH AMENDMENTS -
#### (Defendants: Kent and "Three Unknown Investigators", in their individual capacities)

41.    Plaintiff hereby incorporates and re-alleges paragraphs 1 through 40, as though fully set forth herein.

42.    To be clear, Defendants "Three Unknown Investigators" are being sued for their unconstitutional conduct during the *investigative* phase of Plaintiff's application process. As such, these Defendants are entitled only at most to qualified immunity. Buckley v. Fitzsimmons, 509 U.S. 259, 273, 125 L. Ed. 2d 209, 113 S. Ct. 2606 (1993). Further, Defendant Kent is being sued for providing the Defendants unconstitutional legal advice, and as such, he is entitled only at most to qualified immunity. See, e.g., Burns v. Reed, 500 U.S. 478, 496; 111 S. Ct. 1934; 114 L. Ed. 2d 547 (1991).

43.    Defendants "Three Unknown Investigators" are not insulated from outside political influences because there are no rules prohibiting Committee investigators from having ex parte contact. Plaintiff's research of District of Columbia law has not produced any precedence governing these Defendants' functions. Also, there are insufficient safeguards to prevent Defendants' from abusing their authority because the DCCA Rules do not authorize judicial review of investigative actions, absent "extraordinary circumstances". DCCA Rule 46(g)(3).

44.    The actions and conduct of Defendants "Three Unknown Investigators" violated the First and Fourteenth Amendment rights of the Plaintiff in that said conduct constitutes unconstitutional acts of bad faith and violations of the First and Fourteenth Amendments. Defendants "Three Unknown Investigators" placed Plaintiff's application in abeyance in bad faith and for the purposes of harassing Plaintiff by chilling his federal rights. Also, because Defendants "Three Unknown Investigators" punished Plaintiff for doing what the law plainly

allowed Plaintiff to do (i.e, file a lawsuit against another licensing body), Defendants' conduct "is a due process violation of the most basic sort." Bordenkircher v Hayes, 434 U.S. 357, 363; 98 S. Ct. 663; 54 L. Ed. 2d 604 (1978).

45.     The First Amendment guarantees the fundamental right to file a lawsuit, as well as to engage in constitutionally protected speech. See, Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 741, 103 S. Ct. 2161, 2169, 76 L. Ed. 2d 277 (1983) ("The right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."). "Retaliation by the government that is motivated, at least in part, by a lawsuit or constitutionally protected speech may violate the First Amendment and support an action under 42 U.S.C. § 1983." Campagna v. Mass. Dep't of Envtl. Prot, 206 F. Supp. 2d. 120, 124 (D. Mass. 2002). Therefore, an investigator performing a discretionary function would have known that holding in abeyance Plaintiff's application because Plaintiff's sued Michigan licensing officials would not be objectively reasonable. Additionally, case law like Perry v. Sindermann, 408 U.S. 593, 597; 33 L. Ed. 2d 570; 92 S. Ct. 2694 (1972) would have placed a reasonable official on notice that a licensing application cannot be held in abeyance because the applicant filed a civil rights lawsuit against another licensing body.

46.     Defendants "Three Unknown Investigators" retaliated against Plaintiff because of Plaintiffs openly and honestly held belief that a federal civil rights suit should be filed against Michigan licensing officials for the purposes of protecting fragile, and cherished, constitutional rights. Defendants' conduct would likely chill a person of ordinary firmness from continuing to engage in constitutionally protected conduct, namely, file a civil rights lawsuit.

47.     By definition, bad faith and harassing state proceedings encompass those proceedings that are initiated for or discourage the exercise of constitutional rights. Lewellen v. Raff, 843

F.2d 1103, 1109-1 110 (8th Cir. 1988), cert. denied, 489 U.S. 1033; 103 L.Ed. 2d 229; 109 S.Ct. 1171 (1989). Defendants' conduct was in bad faith and it was designed to discourage the exercise of constitutional rights. With respect to the interests of the Committee, it by definition does not have any legitimate interest in holding in abeyance Plaintiff's application, an act of retaliation designed to deter the exercise of federally secured freedoms. Wilson v. Thompson, 593 F.2d 1375, 1383 (5th Cir.1979).

48.    Upon information and belief, Defendant Kent provided Defendants "Three Unknown Investigators" with unconstitutional legal advice, resulting in Plaintiff's application being placed in abeyance.  A reasonable official in Mr. Kent's position would have known that his advice to Committee investigators was not objectively reasonable and that it would violate Plaintiff's First, Fifth and Fourteenth Amendment rights.   Plaintiff has suffered damages as a result of Defendant Kent's unconstitutional legal advice.

49.    Any immunity provided to Defendants pursuant to District of Columbia law cannot apply in this federal question case. Dubuc v. Mich. Bd. of Law Examiners, 342 F.3d 610, 617 (6th Cir. 2003) ("no state law or rule can immunize anyone from liability for violating the United States Constitution").

50.    By reason of the aforementioned acts of Defendants Kent and "Three Unknown Investigators", Plaintiff's constitutional rights were infringed, to his damage in an amount to be determined by proof at trial.

51.    Defendants Kent's and "Three Unknown Investigators'" acts were committed and carried out by each individual Defendant knowingly, deliberately and maliciously, with the intent to oppress, injure and harass Plaintiff, and with reckless indifference to the civil rights of Plaintiff.

By reason thereof, Plaintiff prays for punitive and exemplary damages from and against the individual Defendants in an amount according to proof at trial.

## CONCLUSION

WHEREFORE, Plaintiff prays that this Court grant the following relief:

1.    Issue a declaratory judgment that Defendant Carlin's conduct in holding in abeyance Plaintiff's licensing application violates and First, Fifth and Fourteenth Amendments to the Constitution of the United States;

2.    Issue a declaratory judgment that the delay in processing Plaintiff's application for a license to practice law has been unreasonable;

3.    Award monetary damages against Defendants Kent and "Three Unknown Investigators" for their unconstitutional conduct, as outlined above;

4.    Award the Plaintiff costs and attorneys fees for having to bring this action; and

5.    Any other relief that is just and appropriate.

Dated: February 5, 2007                                      Respectfully submitted:

Frank J. Lawrence, Jr.
941 Westview Road
Bloomfield Hills, MI  48304
(248) 722-2560

## VERIFICATION OF COMPLAINT
## PURSUANT TO 28 U.S.C. §1746

I verify under penalty of perjury that the foregoing is true and correct.

Executed on: February 5, 2007

Respectfully submitted:

Frank J. Lawrence, Jr.
941 Westview Road
Bloomfield Hills, MI  48304
(248) 722-2560

# STATE OF MICHIGAN
## BOARD OF LAW EXAMINERS

IN RE:

**FRANK J. LAWRENCE, JR.**                        **OPINION**

**APPLICANT**

In August 2005, the State Bar of Michigan District G Character and Fitness Committee recommended that Applicant had not shown by clear and convincing evidence that he currently possesses the requisite character and fitness necessary to be recommended for admission to the State Bar of Michigan. The Standing Committee on Character and Fitness endorsed that recommendation. Applicant did not request a hearing before the Standing Committee. The Board of Law Examiners voted to accept the recommendation and, pursuant to Board of Law Examiners Rule 2(C), a hearing was held before the Board.

For the reasons stated below, the Board of Law Examiners concludes Applicant has not sustained his burden that he currently possesses the requisite character and fitness to become a member of the Michigan bar.

<u>Procedural History</u>

After graduating from law school in 2001, Applicant took the July 2001 Michigan bar examination and received a passing score. His results were not certified because he had not obtained character and fitness clearance from the State Bar of Michigan Standing Committee on Character and Fitness. He withdrew his application in October 2002. In August 2004, Applicant reapplied and State Bar of Michigan District G Character and Fitness Committee held a hearing on August 15, 2005. The District Committee issued its Report and Recommendation on August 19, 2005, stating it did not believe Applicant had

07 0288

**FILED**

FEB - 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

shown by clear and convincing evidence that "he currently possess the requisite good character and fitness to be recommended to the practice of law in this state." The Standing Committee on Character and Fitness endorsed that recommendation. Applicant did not request a hearing before the Standing Committee. Pursuant to State Bar of Michigan Rule 15(5)(f), the District G Committee report and recommendation was transmitted to the Board of Law Examiners. The Board considered that report and voted to accept the unfavorable recommendation. Applicant requested a hearing before the Board under Board of Law Examiners Rule 2(C). That hearing was held on April 20, 2006. Applicant had previously sought, and the Board granted, two one-year extensions to its policy that a passing examination score is valid for three years. After the hearing, Applicant filed a request to supplement the record with new information regarding Issue 3, below.

Hearing

The Board's April 4, 2006 Hearing Order listed five issues for resolution:

"1.    The circumstances underlying the applicant's involvement in the following litigation and administrative actions, including whether or not the applicant's conduct in these matters evidences unnecessarily combative or confrontational behavior:

a. The applicant's apparent disregard for the rule of law when considering the applicant's conduct which led to his August 19, 2000 arrest and subsequent conviction for Interfering with a Police Officer, 48th District Court, People v. Frank Lawrence, Jr, docket #00-13448, in Bloomfield Hills, MI, appeals, sentencing and including the applicant's efforts to discuss the case, out of court, with the court clerk (who was in school with the applicant at the University of Detroit – Mercy School of Law);

2.    The circumstances underlying the applicant's terminations from the following employers:

Michigan Attorney General's Office in July 2001, including the applicant's filing of an application for leave to appeal his termination;

July 27, 1997 Employment Termination from Electronic Data Systems for '. . . being unprofessional with the customer. . .[.']

3.    Whether or not the applicant's conduct of personal financial affairs

2

evidences financial irresponsibility or bad faith toward creditors when considering the following claims and information:

The applicant's $100 debt to Enterprise Rent A Car which was placed for collection with Automated Collection Systems, acct: 99074914, in October 1995 and remains unpaid to date;

The applicant's $625.56 debt to the University of Michigan, acct: 386700102755400, for student loans, which was charged off as uncollectable [sic] in June 2001;

The applicant's $10,680.00 debt to MBNA America, which was turned over to Truelogic Financial for collection in March 2005, account number 1123885;

e.    The applicant's $2,653.00 debt to Discover Financial, account number 6011005350668003, which was charged off as uncollectable [sic].

4. Whether or not the applicant's sworn testimony during the November 19, 2004 Formal Hearing before the Florida Board of Bar Examiners [Formal Hearing Transcript p. 206], indicating he did not intend to practice law in Michigan, disqualifies him from admission to the Michigan Bar when considering the language of MCL 600.934 (1) [Revised Judicature Act] that the applicant must intend in good faith to practice or teach law in Michigan.

5.    Whether or not the applicant's post Character and Fitness District Committee hearing conduct was vexatious, combative, confrontational or was otherwise inappropriate when considering the circumstances of his contact with the office of Mr. Baum on September 8, 2005, [sic] Michigan Legal Services on October 6, 2005."

Before the hearing the Board ruled that a number of other matters raised by the State Bar would not be considered by the Board, mainly because their age made them of little or no probative value.

Applicant presented the testimony of four witnesses other than himself and submitted 27 exhibits. The State Bar presented one witness and 22 exhibits. State Bar counsel made an offer of proof made relating to an additional 30 exhibits the Board had previously ruled inadmissible.

Applicant's four witnesses were Benedict Go, M.D., Donna Greene, William Greene, and Hugh Davis. Dr. Go testified he was a law school classmate of Applicant

3

and that Applicant had acted as his law clerk. Dr. Go represented Applicant in the appeal of the ordinance conviction referenced above. It was Dr. Go's opinion that Applicant has good moral character, and he has no reservation in recommending Applicant for the practice of law. Ms. Greene testified Applicant is a very good friend whom she met while she was employed by the Michigan Employment Security Commission, where Applicant acted as an advocate for claimants. It was her opinion that Applicant is of good moral character. During her time with the MESC she never heard anything derogatory about Applicant. Mr. Greene is Donna Greene's husband. He testified Applicant is very honest and of good moral character. Mr. Davis testified he is representing Applicant in litigation and that Applicant works for him as a law clerk. He would offer Applicant an attorney position if and when he is admitted to practice law. He spoke highly of Applicant's character. His testimony relating to issue 5, above, will be discussed below. Applicant also submitted six letters of recommendation, each of which also spoke highly of him. Three of those letters were from Dr. Go, Ms. Greene, and Mr. Davis.

As noted, Applicant testified in his own behalf. He was examined on each of the issues listed above. His testimony will summarized below in the context of each issue.

## Standard of Review and Burden of Proof

Board of Law Examiners character and fitness hearings are heard *de novo*. Applicant has the burden of proving by clear and convincing evidence that he has "the current good moral character and general fitness to warrant admission to the bar." State Bar of Michigan Rule 15(15). Clear and convincing evidence is defined as:

"Clear and convincing evidence is evidence that 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct, and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.' *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995), quoting *In re Jobes*, 108 NJ 394, 407-408; 529 A2d 434 (1987)." *In re Chmura (After Remand)*, 464 Mich 58, 72 (2001).

## Good Moral Character

4

The requirement that persons seeking admission to the bar must be of good moral character is found in Board of Law Examiners Rule 1(B) and MCL 600.934. The Rule states:

An applicant for admission to the practice of law must

\*        \*        \*

(B) possess good moral character[.]

The requirement of "good moral character" has been in the Board's rules since at least 1895. MCL 600.934(1) states:

(1) A person is qualified for admission to the bar of this state who proves to the satisfaction of the board of law examiners that he or she is a person of good moral character, is 18 years of age or older, has the required general education, learning in the law, and fitness and ability to enable him or her to practice law in the courts of record of this state, and that he or she intends in good faith to practice or teach law in this state. Additional requirements concerning the qualifications for admission are contained in subsequent sections of this chapter. As used in this subsection, "good moral character" means good moral character as defined and determined under 1974 PA 381, MCL 338.41 to 338.47.

MCL 338.41 defines good moral character:

(1) The phrase "good moral character", or words of similar import, when used as a requirement for an occupational or professional license or when used as a requirement to establish or operate an organization or facility regulated by this state in the Michigan Compiled Laws or administrative rules promulgated under those laws shall be construed to mean the propensity on the part of the person to serve the public in the licensed area in a fair, honest, and open manner.

The "good moral character" standard has been statutorily in existence since at least 1838. Reference to MCL 338.41 was first made in 1978. To determine the common, ordinary meaning of "fair," it is appropriate to consult a dictionary. *Stanton v City of Battle Creek*, 466 Mich 611, 617 (2002). *Random House Webster's College Dictionary* (2001), defines "fair" as:

2. legitimately sought, done, given, etc.: proper under the rules: *a fair fight*. . . . 12. courteous; civil: *fair words—adv.* 13. in a fair manner: *He doesn't*

*play fair.*

The Rules of Procedure of the Standing Committee on Character and Fitness, in particular Rule E(5), establish standards for applicants to meet in order to obtain character and fitness approval. That Rule states:

> "An Applicant must successfully meet the general requirements for admission to the practice of law as set forth in the Rules for the Board of Law Examiners. In addition, in order to be recommended for admission by the Standing Committee on Character and Fitness and Fitness, the Applicant must demonstrate he or she:
>
> a. Will exercise good judgment, both ethically and professionally, on behalf of clients or oneself when conducting business and when engaging in financial dealings;
>
> b. Will avoid illegal, dishonest, fraudulent or deceitful conduct in one's personal and professional relationships and with respect to one's legal obligations;
>
> c. Will avoid acts which exhibit disregard for health, safety, welfare and rights of others;
>
> d. Will conduct oneself with respect for and in accordance with the law; and
>
> e. Will conduct oneself professionally and in a manner that engenders respect for the law and the profession."

The Board of Law Examiners is not bound by the standards contained in the Standing Committee's rules of procedure. Those standards, however, certainly can inform the inquiry under BLE Rule 1(B) and MCL 600.934. Additionally, each of those standards fit within the dictionary definition of "a fair, honest, and open manner." Therefore, it is legitimate to consider those standards in determining whether an applicant has "good moral character." Because there is no inherent conflict between MCL 600.934 and Board Rule 1(B), it is not necessary for the Board to decide whether its rule must yield to the statute under *McDougall v Schanz*, 461 Mich 15 (1999).

<u>Issues</u>

The issues will be discussed in the order presented by the April 4, 2006 Hearing Order.

**1. The circumstances underlying the applicant's involvement in the following litigation and administrative actions, including whether or not the applicant's conduct in these matters evidences unnecessarily combative or confrontational behavior:**

**a. The applicant's apparent disregard for the rule of law when considering the applicant's conduct which led to his August 19, 2000 arrest and subsequent conviction for Interfering with a Police Officer, 48th District Court, <u>People v. Frank Lawrence, Jr,</u> docket #00-13448, in Bloomfield Hills, MI, appeals, sentencing and including the applicant's efforts to discuss the case, out of court, with the court clerk (who was in school with the applicant at the University of Detroit – Mercy School of Law).**

The District Committee made the following finding regarding this issue:

"The Committee makes the following finding: Applicant's conduct in the litigation and administrative matters listed in the referral letter (with the exception of the matter described in subparagraph j.) along with his responses to questions about those matters demonstrates that he currently does not possess the requisite character and fitness for the practice of law."

With respect to Applicant's arrest and conviction of an ordinance violation, applicant's actions at the time show a lack of judgment. The age of the incident, however, leads the Board to conclude that standing alone, the incident is not dispositive of Applicant's present character and fitness, although the lack of judgment shown may have foreshadowed Applicant's actions discussed below relative to Issue 5.

With respect to the conversation between Applicant and the law clerk to the judge assigned to Applicant's ordinance violation, Judge Edward Avadenka, the Board concludes that no misconduct occurred and that this matter has no bearing on Applicant's present character and fitness to practice law.

**2. The circumstances underlying the applicant's terminations from the following employers:**

**Michigan Attorney General's Office in July 2001, including the applicant's filing of an application for leave to appeal his termination;**

**July 27, 1997 Employment Termination from Electronic Data Systems for 'being unprofessional with the customer . . . .'**

The District Committee made the following finding regarding this issue:

"The Committee makes the following finding: Although the Committee believes that the Applicant has shown modest improvement in his ability to commit to a job, to behave responsibly in that employment and to undertake his job obligations with diligence, the Committee does not believe that the Applicant has proven these things by clear and convincing evidence."

The Board declined to address five employment situations considered by the District Committee because they were too distant in time to be of probative value. The Board has considered the two remaining employment actions and concludes they have no bearing on Applicant's present character and fitness to practice law.

**3. Whether or not the applicant's conduct of personal financial affairs evidences financial irresponsibility or bad faith toward creditors when considering the following claims and information:**

**The applicant's $100 debt to Enterprise Rent A Car which was placed for collection with Automated Collection Systems, acct: 99074914, in October 1995 and remains unpaid to date;**

**The applicant's $625.56 debt to the University of Michigan, acct: 386700102755400, for student loans, which was charged off as uncollectable [sic] in June 2001;**

**The applicant's $10,680.00 debt to MBNA America, which was turned over to Truelogic Financial for collection in March 2005, account number 1123885;**

**e.    The applicant's $2,653.00 debt to Discover Financial, account number 6011005350668003, which was charged off as uncollectable [sic].**

The District Committee made the following finding regarding this issue:

"The Committee makes the following finding: The Committee believes that the Applicant's conduct of his personal financial affairs evidences financial irresponsibility towards his creditors."

In his testimony before the Board, Applicant has generally acknowledged the legitimacy of his debts. The Board is satisfied by Applicant's testimony that he intends on paying those debts once he is employed. The Board finds Applicant has met his burden of showing that his financial situation does not sufficiently demonstrate financial irresponsibility or bad faith toward creditors. Thus, the Board does not consider this a factor in arriving at its overall decision. Applicant's request to supplement the record is therefore denied as moot. Applicant is urged to continue to make efforts at paying his debts, including obtaining non-legal employment in order to do so.

**4.  Whether or not the applicant's sworn testimony during the November 19, 2004 Formal Hearing before the Florida Board of Bar Examiners [Formal Hearing Transcript p. 206], indicating he did not intend to practice law in Michigan, disqualifies him from admission to the Michigan Bar when considering the language of MCL 600.934 (1) [Revised Judicature Act] that the applicant must intend in good faith to practice or teach law in Michigan.**

The District Committee made the following finding regarding this issue:

"The Committee makes the following finding: The Applicant does not intend in good faith to practice law or teach in the State of Michigan, as required by MCL 600.934(1), and therefore he should be disqualified from admission to the State Bar of Michigan."

The District Committee also found that it was not bound by the findings of fact and conclusions of law made by Florida bar admissions authorities. Likewise, the Board had previously ruled that it was not bound by the Florida ruling denying his admission to the Florida bar. Applicant's testimony was clear during the April 20, 2006 hearing that he intends to practice law in Michigan. The Board accepts that testimony and determines Applicant has met his burden of proof on this issue.

**5. Whether or not the applicant's post Character and Fitness District Committee hearing conduct was vexatious, combative, confrontational or was otherwise inappropriate when considering the circumstances of his contact with the office of Mr. Baum on September 8, 2005, [sic] Michigan Legal Services on October 6, 2005.**

This issue relates to communications made by Applicant after the district committee issued its opinion on August 18, 2005. These communications are reflected in State Bar exhibits 19 and 20. Two of the committee members were David H. Baum and Soni Mithani. Mr. Baum is Assistant Dean of Students at the University of Michigan Law School. At the relevant time, Ms. Mithani served as Legal Director for Community Legal Resources, apparently a legal services organization. Exhibit 19 is a letter from Mr. Baum to the State Bar summarizing a telephone conversation Applicant had with Mr. Baum's assistant. Applicant testified the following letter "embodie[d] the general crux of what [he] said":

> I was a member of the District G Character and Fitness panel that interviewed Frank Lawrence, Jr. at a hearing held on Monday, August 15, 2005. I am also Assistant Dean for Student Affairs at the University of Michigan Law School.
>
> At about 4:20 p.m. on September 8, my assistant, Marilyn Genoa, received a phone call from a man asking for contact information for the Law School's student government. When she asked the caller to identify himself, he told her his name was Frank Lawrence and that he had been "on a State Bar panel with David Baum." He went on to tell her that I was not very fair to him on this panel, and that the reason he believed I had been so unfair was because of a web site that he operates. Mr. Lawrence further informed her he wanted to come to the Law School to address our student body to let them know how I had treated him. He said words to the effect that "the students deserve to know what kind of a man [I am] and to see another side of [me]." Shortly thereafter, my assistant told Mr. Lawrence that she in fact worked for me and ended the telephone call. [Exhibit 19]

Exhibit 20 is a letter from Applicant to Marilyn Mullane, a member of the Board of Directors of Community Legal Resources. The letter states:

> It is my understanding that you are on the Board of Directors at Community Legal Resources, the organization that Soni Mithani serves as its Legal Director. I would like to share with you a recent troubling experience that I had with Ms. Mithani.
>
> I am a civil rights activist who graduated from the University of Detroit-Mercy School of Law in 2001, and immediately thereafter, I multi-stated and passed the Michigan Bar Examination. Since that time, I have experienced a great deal of difficulty in gaining admission to the Michigan

Bar. In December 2003, the Michigan Bar Journal published an article by civil rights attorney Robert D. Horvath, which explained how the State Bar had "grossly misused" its admission process to exclude me from the Bar because of my protected First Amendment activities. *See, Character and Fitness Review – Is the Process Fit?*, 82 Mich Bar Jrnl 9 (December, 2003). See also, Lawrence v Van Aken, 2004 WL 228989 (WD Mich), 2004 U.S. Dist. LEXIS 956, aff'd by Lawrence v Van Aken, 316 FSupp2d 547 (WD Mich 2004).

On August 15, 2005, the State Bar held a hearing to evaluate my fitness for State Bar membership, and the Legal Director of Community Legal Resources, Soni Mithani, was chosen by the Bar as one of the three panelists to conduct the evaluation. During my interview, it became clear to me that my political beliefs were being used as a basis to exclude me from the practice of law, and I was disturbed to see Ms. Mithani participate in this process.

For example, I was asked about my views on our (rather conservative) state court system, and I responded honestly by saying that I believe that the courts do not adequately protect our constitutional rights and that civil rights cases should generally be brought in federal courts, if possible. In an inaccurate paraphrase of my testimony on this point, Ms. Mithani concluded:

> Applicant made it clear that, at least in part because of the litigation, he has little respect – and indeed considerable distain [sic] – for the state court system. For example, he explained that it became his goal early on in the litigation to do whatever he could to get the matter into Federal court. He explained that it is really the Federal courts that are the guardians of the constitution, and that, in contrast, the state court system fails adequately to protect individuals' constitutional rights. We are concerned about providing a law license to someone who, even before he has handled his first case as a member of the bar, has effectively written off such a huge component of the justice system.

This represents a cruel and unfair manipulation of my testimony. Regarding my personal beliefs about the *state* court system, our nation's highest *federal* court stated in a bar admission case "And whatever justification may be offered, a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit *because of what he believes.*" Baird v. State Bar of Arizona, 401 U.S. 1, 7; 91 S. Ct. 702; 27 L. Ed. 2d 639 (1971) (emphasis added). No one disputes that Ms. Mithani has a very high opinion of our state court system, perhaps one of the most

11

conservative in the country. However, I would urge Ms. Mithani to familiarize herself with controlling First Amendment principles articulated in Baird.

Ms. Mithani made it clear to me that it is important for her to get with the majority. By dedicating your time to be a member of the Board of Directors of Community Legal Resources, an organization dedicated to indirectly helping metro-Detroit's less fortunate, I believe that you understand that supporting the majority is not always in the best interest of the people. I just hope that, someday, Ms. Mithani might come to this realization. Thank you for your time. [Exhibit 20]

Applicant was questioned regarding these communications. He testified he made them because he felt an injustice had taken place. He was representing himself at the time. When asked why he didn't only just prosecute an appeal, he testified:

THE WITNESS: I was outraged at what -- I was disappointed really at what had happened. I was upset that the Bar had represented to the federal courts, as they are now at this very moment in Cincinnati, that they don't use first amendment activities against applicants when, in fact, if those judges in Cincinnati right now were to hear what -- you know, were to look at this, they'd realize that there were some dishonest statements made.

When I reflected on the five years of misery and of a nightmare that I'd been involved in over this trying to just earn a living in my profession and be a productive citizen and I sent the letter, and I regret doing it -- I sent one letter and I regret doing it, but the only way I -- and there's no really way I can explain it other than to say that I was overwhelmed at what -- this opinion was overwhelming when I read it.

MR. RHEAUME: Okay.

THE WITNESS: And I wish that each of you could have heard my testimony at the district committee because I really did do my best to show them that what I wanted to do was be a good attorney and productive citizen, and they took everything I said and they were very unfair about the way it was translated on this sheet, and it convinced me that there was no way I could get a fair hearing in front of these individuals at the Bar.

And the only way to explain it, Mr. Rheaume, is to say that I was extremely troubled and disappointed to see the dichotomy between what the Bar was representing about how we won't use your beliefs and we won't use these things against you and then I see it actually done in writing. I thought that was rather brazen, and I regret sending those letters but I was very troubled

12

at what I read and it caused me to do that. [Hearing Transcript, pp 148-149]

Applicant was questioned about utilizing the appellate process:

MS. PARKER: Okay, let me just say, then, that I still am concerned because to me the explanation that you're offering presently is to say -- you know, you are not alone in your concerns about the constitution and your belief in the constitution, you're not alone. You're not unique in that, okay? And -- but I'm saying to you that there is a forum in which those views are to be expressed and it is not in an individual's workplace. It's not in an individual's workplace, and I'm not really certain, Mr. Lawrence, that as you, you know, again state, you know, how strongly you believe in the constitution and the fact that you did not swear in expressing your opinion, I'm not certain that you understand that you were in the wrong forum absolutely when you put pen to paper and wrote a district committee member's, you know, workplace or, you know -- yeah, to that person's workplace. I don't know that you understand really that there was something fundamentally wrong with that. Do you at this point understand that?

THE WITNESS: Well, of course I understand that the -- if my -- you know, my goal is to get a law license and the appropriate forum to appeal that decision is here, of course I understand that, but my goal in doing what I did was not to cause someone a problem in their work but to convey a message of disappointment that I was experiencing in the way that I was treated by this person, so as far as getting things reversed, I'm trying to do that now.

MR. RHEAUME: But you wrote to her --you wrote to the employer. You didn't write her -- this person a letter and say, you know, you're wrong in what you did and I'm going to show you you're wrong when you -- in my appeal. You wrote to her employer.

THE WITNESS: I wrote to community activists that are -- that do not work there. This is not really -- I think that's a little unfair to say it's her employer.

MR. RHEAUME: Okay, they didn't employ her?

THE WITNESS: They're the board. They're the board that oversees the legal services.

MR. RHEAUME: You wanted to affect her work with this community -- with this department, didn't you?

13

THE WITNESS: No.

MR. RHEAUME: You did not?

THE WITNESS: I did not.

MR. RHEAUME: So why did you write to her?

THE WITNESS: To convey a message.

MR. RHEAUME: To who?

THE WITNESS: To the individual community leaders who presumably are interested in civil rights too because of the nature of the work that they do, to let them know about the way my civil rights were treated, and that's all I intended to do, to convey a message. [Hearing Transcript, pp 155-157]

With respect to Exhibit 19, Applicant described his intent in contacting the University of Michigan:

THE WITNESS: I called the student body. I wanted to get in contact with the student government, student body.

MS. PARKER: And what was your intent if you had been able to do that? You wanted to get in touch with them for what reason?

THE WITNESS: I wanted to come to the school and speak to them about the character and fitness process and the way that I -- the things that I experienced and try to get individuals to help me with my litigation.

MS. PARKER: Okay. Did you -- was it ever your intention to say to the students -- you know, to talk about the character or the type of person that you believed David Baum was?

THE WITNESS: Well, I was going to give them copies of my district committee report and recommendation, and I was going to point out to them how members of the panel can conclude that someone's fair, open, and honest but they don't like things that he said, including the fact that he believes the federal courts are the guardian of the constitution and that the Board of Law Examiners would actually approve that. [Hearing Transcript, pp 164-165]

Applicant commented that he sent emails to all the law schools in Michigan and further discussed his intent and the substance of the conversation:

THE WITNESS: Well, just to let you know, I sent e-mails out to all law schools in Michigan and -- but not -- this specific one, you know, I mentioned Dean Baum because he was on my panel. But this is not the only school that I wanted to contact because I wanted to get individuals involved in this and let them know what's going on and that the Board of Law Examiners had actually approved that language. Of course, I'd be given a hearing later on, which is kind of like due process in reverse because I'm here appealing what the board has already approved, and that's part of the record, but I wanted --

MS. PARKER: Did you say, Mr. Lawrence, to his assistant words to the effect that, quote, The students deserve to know what kind of man Dean Baum is and to see another side of him, end quote; did you say words to that effect?

THE WITNESS: I don't remember my exact quote, but I did convey to her that I felt that Dean Baum had mistreated me and that he did not follow the requirements of the statute -- that the statute requires in my case, and the students ought to know about it. [Hearing Transcript, pp 166-167]

With regard to whether his communication was appropriate, Applicant testified:

[Ms. Parker]: Do you think that it was appropriate for you to reach out to any student there at the University of Michigan where the assistant dean works for the purpose of letting them know that he's really not who they think he is; do you think that that was appropriate?

THE WITNESS: Well, you say -- you know, you say to let them know that he's not who they think he is, and I'm not saying that, but what I am saying is I did contact them and I felt that I wanted to convey to them that I had been mistreated, and I also wanted to get them to help me in my case. And I don't feel that that -- you know, I regret the situation as a whole, I regret it, but if you want me to say that what I did was not within my right, I have a hard time doing that because it was, but putting the rights aside, which is really what I want to do today, putting the rights aside, I regret writing these letters and doing so, I regret that it has to be an issue today and that it has to take up our time, and I regret the fact that I did it and I regret the fact that I got upset and wrote these letters. I should have just appealed it, but, you know, it seems to me like you want me to say, well, you know, what I did was unethical or inappropriate and I can't really say that. You know, I wanted to convey a message to these students and that's about all. [Hearing Transcript, pp 168-169]

15

my justification for why I felt that -- why I did it at the time.

Q. And that's because you felt it was a justified move on your part?

A. Well, what I said was that the -- that I felt Mr. Baum had violated the law by saying that -- believing that the federal court's the guardians of the constitution and --

Q. Well, I will tell you this, it seems to me to be taken out of context the way that I would read it myself, but regardless, you're telling us that because that statement is in that report you feel Mr. Baum violated the law?

A. I think it's -- it shows the true colors of what was really going on there, and I understand there's a lot in the report, I understand, but when -- but there's no reason for that statement to be in there. That was a slip up where it showed what really was going on behind the scenes.

Q. And what was going on behind the scenes in your opinion is that they're going to violate -- violate the law; is that what it is?

A. No, it's that the State Bar made -- has a lack of candor when it comes to making litigation statements between what's going on in this room and what's going on in Cincinnati right now. That's what I'm saying.

Q. And in what way?

A. Well, Mr. Baum is an agent of the State Bar, and by representing in legal pleadings that the State Bar does not use first amendment activities, or there's no evidence, I should say, that there's -- that anybody's ever been denied admission for exercising certain rights in one proceeding and then saying in your report and recommendation and, again, this is the Bar speaking because Mr. Baum is an agent of the Bar, that it's grounds for denial of a license because you hold certain beliefs that --

Q. But you have to admit --

A. -- should be conveyed to the board member -- let me finish, please.

Q. -- that's not --

A. That should be conveyed to the board members as the justification that I had at the time, but I don't want to take away from the fact that I do regret sending the letter. I shouldn't have done it and I've repeatedly said that today.

17

Q. Okay.

A. The only reason I'm saying this is so that I can give these ladies and gentlemen a view of what was going on in my mind at the time.

Q. And you regret it now because it's causing you trouble here today; is that why you --

A. Among other things.

Q. -- regret it?

A. Among other things.

Q. Any other reason you regret it?

A. Yeah, and I unfortunately am repeating myself here, but I regret it because -- for the very reason that we spoke about earlier with Mr. Rheaume, I realize that there was a proper channel to go through, namely the Board of Law Examiners process, and get it reversed as opposed to taking my concerns right to the people themselves. [Hearing Transcript, pp 171-174]

One of Applicant's attorneys, Hugh Davis, was cross-examined regarding Applicant's post-district committee opinion communications. He opined that they were inappropriate. He also testified Applicant's actions were "grievously wrong" and that he found them "personally reprehensible." He did not believe Applicant's actions should bar his admission. Mr. Davis did acknowledge that if Applicant had been representing a client in the same situation and did what he did here, his actions would have been "absolutely improper."

As stated above, Applicant has the burden of proving by clear and convincing evidence that he is of good moral character, i.e., that he has the present character and fitness to practice law. The Board must be left with the "firm belief or conviction" that Applicant has the required character and fitness. The Board concludes that Applicant has not met his burden of proof on this issue. Instead of working solely within the appellate process, he chose to attack the individuals involved in the process. Applicant states he would not act in the same manner if he was representing a client. The recent nature of his

18

actions makes his statement less than convincing. Applicant made what one of his own attorneys, Mr. Davis, called reprehensible communications, while in the midst of the very process used to determine whether he had the requisite character and fitness to practice law. It is difficult to conceive how Applicant would consider this acceptable behavior, especially during the time when his character was already under scrutiny. At a bare minimum, he demonstrated a gross lack of judgment. Further, although he denies trying to affect the employment of Mr. Baum and Ms. Mithani, his letter and telephone call appear to have been calculated to cause financial harm or embarrassment to them. Applicant has not demonstrated an understanding that he needs to work within the process. Indeed, he testified he could not say that what he did was inappropriate. While he regrets his actions, that regret appears to be more as a result of the additional trouble it has caused him than because his actions were wrong.

Conclusion

Using either the statutory definition of "good moral character" or the standards developed by the Standing Committee on Character and Fitness, Applicant has not met his burden of proof. The subject communications show a propensity to act in other than a "fair" manner. He has not shown that he will exercise good judgment, that he will conduct himself professionally and with respect for the law. Applicant's political views are not being used against him. His view of the role of state and federal courts in civil rights matters is irrelevant to the Board's determination. Instead, it is the manner in which he acted that is crucial.

State Bar of Michigan Rule 15(18) provides that an applicant denied character and fitness certification by the Board of Law Examiners may not reapply for certification for two years following that denial. In this instance, however, the Board determines that Applicant may reapply in one year from the date of this opinion because the Board senses there has been some improvement under the to-date brief tutelage of Mr. Davis. The only issue that will then be before the State Bar and Board are any actions of the Applicant from the date of this opinion until that time. The Board is hopeful that Applicant's tutelage under Mr. Davis will continue. Furthermore, Applicant's passing bar

examination score will remain valid during this time and if he reapplies within fourteen months after the date of this opinion, that score will remain valid until a determination is made on that application. The Standing Committee on Character and Fitness is urged to expedite consideration of Applicant's application.

Linda V. Parker<br>
Louis A. Smith<br>
Gerald M. Marcinkoski

I concur in the decision of the Board that Mr. Lawrence has not met his burden of proof concerning present character and fitness. I also concur in the decision that he should be allowed to reapply within a shortened period of time and at any subsequent hearing the only character and fitness issues to be considered are those that have occurred since the date of this opinion.

The reason I write this opinion is that I believe that all of the issues presented to the Board should be addressed in our opinion. To be clear, my opinion of these issues does not affect my opinion on the lack of current character and fitness but does play a role in my opinion that the time to reapply be shortened.

Mr. Lawrence raised the issue that at the time of his misdemeanor conviction the prosecutor and the court used his bar license as a "bargaining chip" to have him dismiss his federal lawsuit. The State Bar called one witness and it was to provide testimony on this issue. The witness was the prosecutor at the time of this offense. The testimony provided by the State Bar was directly contradicted by a transcript of a hearing held in the judge's chambers. It is clear to me that an effort was made to have Mr. Lawrence dismiss his federal suit in exchange for "help" with the State Bar admissions process.

From exhibits received into evidence it is also clear to me that Mr. Lawrence was the subject of improper and belittling emails sent by both the trial judge in the misdemeanor case and a State Bar employee.

Even though I agree with Mr. Lawrence that these occurrences took place, I do not agree that they are an excuse for his actions taken after the decision of the District Committee. His actions were an intentional plan to attack the individuals who

20

participated in the decision. His own attorney and witness called these actions "reprehensible" for an attorney and I do not see the distinction for a bar applicant. Mr. Lawrence needs to understand that you do not attack the individual, you challenge the decision in the appropriate forum. He is currently working with Mr. Davis who was his best witness and supporter. Mr. Davis believes that under his guidance Mr. Lawrence will channel his efforts in an appropriate manner and avoid these personal attacks. We obviously have no assurance that Mr. Lawrence will stay with Mr. Davis or for that matter listen to him, but if he does I would not expect any of these issues to arise in the next year.

Mr. Lawrence needs to take responsibility for his actions rather than shift the blame to someone else. There is no question that Mr. Lawrence was not treated right in the instances I have referred to, but that does not excuse his actions subsequent to the District Committee hearing. I believe that Mr. Lawrence would be an excellent attorney, but knowledge of the law is only one of the aspects of character and fitness. Mr. Lawrence, to date, has fallen short in the other aspects of proving his current character fitness.

William E. Rheaume

Hon. Rae Lee Chabot took no part in the consideration of this matter.

June 14, 2006

21

No. 07-1026

### In The

# United States Court of Appeals

### for the Sixth Circuit

---

FRANK J. LAWRENCE, JR.
*Plaintiff – Appellant,*
v.

JOHN T. BERRY, ET. AL.,
*Defendants – Appellees.*

---

**On Appeal from the United States District Court
for the Western District of Michigan
Southern Division**

---

**FINAL BRIEF OF APPELLANT**

---

Dennis B. Dubuc (P67316)
Essex Park Law Office, P.C.
12618 10 Mile Rd.
South Lyon, MI 48178
(248) 486-5508

*Counsel for Plaintiff-Appellant
Frank J. Lawrence, Jr.*

**Oral Argument Requested**

07 0288
**FILED**

FEB - 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## STATEMENT OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6th Cir. R. 26.1 Appellant makes the following statements:

1.  Is any party a subsidiary or affiliate of a publicly owned corporation?

    No.

2.  Is there a publicly owned corporation, not a party to the appeal, which
    has a financial interest in the outcome?

    No.

Dennis B. Dubuc (P67316)

Dated: January 22, 2007

ii

# TABLE OF CONTENTS

STATEMENT OF CORPORATE AFFILIATIONS
    AND FINANCIAL INTEREST. . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . .iii

TABLE OF CASES, CITATIONS, AUTHORITIES. . . . . . . . . . . v

STATEMENT IN SUPPORT OF ORAL ARGUMENT. . . . . . . . . . . x

STATEMENT OF SUBJECT MATTER
    AND APPELLATE JURISDICTION. . . . . . . . . . . . . . .1

STATEMENT OF ISSUES FOR REVIEW. . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . .3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . 10

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . 20

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . .27

ARGUMENTS. . . . . . . . . . . . . . . . . . . . . .28

I.    THE <u>ROOKER-FELDMAN</u> DOCTRINE DOES NOT BAR
    APPELLANT'S CIVIL RIGHTS CLAIMS IN COUNT I OF HIS
    COMPLAINT, WHICH CONSIST OF AN AS-APPLIED
    CHALLENGE TO A FINAL ADMINISTRATIVE DECISION
    OF THE MICHIGAN BOARD OF LAW EXAMINERS, A
    STATE ADMINISTRATIVE AGENCY THAT WAS CREATED
    BY THE MICHIGAN LEGISLATURE. . . . . . . . . . . . . 28

    ALTERNATIVELY, ASSUMING <u>ARGUENDO</u> THAT THE
    <u>ROOKER-FELDMAN</u> DOCTRINE DOES APPLY TO SUCH
    ADMINISTRATIVE DECISIONS, APPELLANT'S NOTICE OF
    RESERVATION OF FEDERAL CLAIMS AND DEFENSES
    PURSUANT TO <u>England v. Louisiana State Bd. of Medical</u>

Examiners, 375 U.S. 411; 84 S. Ct. 461; 11 L. Ed. 2d 440 (1967),
WHICH APPELLANT ASSERTED AT THE ONSET OF HIS
STATE ADMINISTRATIVE PROCEEDINGS, PRECLUDES
APPLICATION OF THE ROOKER-FELDMAN DOCTRINE
IN THIS CASE. . . . . . . . . . . . . . . . . . . . . . . 28

II.    APPELLANT'S AS-APPLIED PROSPECTIVE RELIEF CLAIMS,
WHICH PERTAIN TO HIS FUTURE REAPPLICATION
PROCESS, ARE RIPE FOR JUDICIAL REVIEW AND
APPELLANT HAS STANDING TO RAISE THOSE CLAIMS,
GIVEN THAT HE HAS ALREADY BEEN DENIED ADMISSION
IN A FINAL ADMINISTRATIVE DECISION, DUE TO THE
LICENSING OFFICIALS' DISAPPROVAL OF
HIS STATEMENTS ABOUT CERTAIN STATE OFFICIALS,
AND APPELLANT'S COMPLAINT STATES THAT HE
INTENDS TO CONTINUE ENGAGING IN THOSE SAME,
OR SUBSTANTIALLY SIMILAR, ACTIVITIES IN THE
FUTURE. . . . . . . . . . . . . . . . . . . . . . . . . 30

III.   INDIVIDUALS WHO PERFORM "INVESTIGATIVE"
FUNCTIONS PURSUANT TO MICHIGAN LAW, AND
WHO HAVE NO AUTHORITY TO APPROVE OR DENY AN
APPLICANT'S APPLICATION TO PRACTICE LAW, ARE
NOT ENTITLED TO ABSOLUTE IMMUNITY FROM SUIT. . . .36

ALTERNATIVELY, APPELLANT'S COMPLAINT PLEADED
SUFFICIENT FACTS AND LAW TO OVERCOME A
PRE-ANSWER MOTION TO DISMISS BASED UPON
QUALIFIED IMMUNITY. . . . . . . . . . . . . . . . . 36

IV.    THE DISTRICT COURT ABUSED ITS DISCRETION IN
DENYING APPELLANT'S MOTION FOR A PRELIMINARY
INJUNCTION. . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION AND RELIEF REQUESTED . . . . . . . . . . . .46

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . 48

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . 49

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>Ammex, Inc. v. Cox</u>, 351 F.3d 697 (6th Cir. 2003). . . . . . . . . . . 23

<u>Antoine v. Byers & Anderson</u>,
    508 U.S. 429; 113 S. Ct. 2167; 124 L. Ed. 2d 391 (1993). . . . . . . .

<u>Achterhof v. Selvaggio</u>, 886 F.2d 826 (6th Cir. 1989). . . . . . . . . . . 40

<u>Anderson v. Creighton</u>,
    483 U.S. 635; 107 S. Ct. 3034; 97 L. Ed. 2d 523 (1987). . . . . . . . 42

<u>Baird v. State Bar of Arizona</u>,
    401 U.S. 1; 91 S. Ct. 702; 27 L. Ed. 2d 639 (1969). . . . . . 8, 26, 43, 44

<u>Barnes v. McDowell</u>, 848 F.2d 725 (6th Cir. 1988). . . . . . . . . . . 21, 29

<u>Barrett v. Harrington</u>, 130 F.3d 246 (6th Cir. 1997). . . . . . . . . . . . 32

<u>Bloch v. Ribar</u>, 156 F.3d 673 (6th Cir. 1998). . . . . . . . . . . . . . . 41

<u>Bose Corp. v. Consumers Union of United States, Inc.</u>,
    466 U.S. 485; 80 L. Ed. 2d 502; 104 S. Ct. 1949 (1984). . . . . . . . 27

<u>Buckley v. Fitzsimmons</u>,
    509 U.S. 259; 113 S. Ct. 2606; 125 L. Ed. 2d 209 (1993). . . . . 8, 24, 25

<u>Burford v. Sun Oil Co.</u>, 319 U.S. 315; 87 L. Ed. 1424; 63 S. Ct. 1098 (1943) . . 5

<u>Burns v. Reed</u>, 500 U.S. 478; 114 L. Ed. 2d 547; 111 S. Ct. 1934 (1991). . . . 36

<u>Butz v. Economou</u>,
    438 U.S. 478; 57 L. Ed. 2d 895; 98 S. Ct. 2894 (1978). . . . . . . 25, 36

<u>Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati</u>,
    363 F.3d 427 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . 45

Cleavinger v. Saxner,
    474 U.S. 193; 88 L. Ed. 2d 507; 106 S. Ct. 496 (1985). . . . . . . 37, 38

Cohen v. California,
    403 U.S. 15; 29 L. Ed. 2d 284; 91 S. Ct. 1780 (1971). . . . . . . . . 17

Daugherty v. Campbell, 935 F.2d 780 (6th Cir. 1991). . . . . . . . . . 42

Dean v. Byerley, 354 F.3d 540 (6th Cir. 2004). . . . . . . . . . . . . . .12

Detroit Free Press v. Ashcroft, 303 F.3d 681 (6th Cir. 2002). . . . . . . . .43

District of Columbia Court of Appeals v. Feldman,
    460 U.S. 462; 75 L. Ed. 2d 206; 103 S. Ct. 1303 (1983). . . . . . *passim*

DLX, Inc. v. Kentucky, 381 F.3d 511(6th Cir. 2004). . . . . . . . . . 21, 29

Dubuc v. Mich. Bd. of Law Examiners,
    342 F.3d 610 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . .20, 22, 33

Edelman v. Jordan, 415 U.S. 651; Ed. 2d 662; 94 S. Ct. 1347 (1974). . . . 22, 33

Elrod v. Burns,
    427 U.S. 347; 49 L. Ed. 2d 547; 96 .S Ct. 2673 (1976) . . . . .27, 35, 45

Entergy Ark., Inc. v. Nebraska, 210 F.3d 887 (8th Cir. 2000). . . . . . . 22, 33

England v. Louisiana State Bd. of Medical Examiners,
    375 U.S. 411; 11 L. Ed. 2d 440; 84 S. Ct. 461 (1967). . . . . 2, 9, 12, 28

Ex parte Young, 209 U.S. 123; 52 L. Ed. 714; 28 S. Ct. 441 (1908). . . . . . 22

Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,
    544 U.S. 280; 125 S. Ct. 1517; 161 L. Ed. 2d 454 (2005). . . . . . 21, 29

Fieger v. Ferry, ___F.3d ___ (6th Cir. 2006). . . . . . . . . . . . . .23, 35

Feiger v. Thomas,
    74 F.3d 740 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . 18, 19

Forrester v. White,
    484 U.S. 219; 98 L. Ed. 2d 555; 108 S. Ct. 538 (1988). . . . . . . 37, 38

Grendell v. Ohio Supreme Ct., 252 F.3d 828 (6th Cir. 2001). . . . . . . . .22

Kardules v. City of Columbus, 95 F.3d 1335 (6th Cir. 1996). . . . . . . . .36

Kolender v. Lawson,
    461 U.S. 352; 75 L. Ed. 2d 903; 103 S. Ct. 1855 (1983). . . . . . . .23

Konigsberg v. State Bar of California,
    353 U.S. 252; 77 S. Ct. 722; 1 L. Ed. 2d 810 (1957). . . . . . 30, 31, 44

Lawrence v. Chabot,
    2003 U.S. Dist. LEXIS 17894 (W.D. Mich. 2003). . . . . . . . . . 18

Lawrence v. Chabot,
    2006 U.S. App. LEXIS 12191 (6th Cir. 2006). . . . . . . . . . . 3, 37

Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,
    507 U.S. 163; 113 S. Ct. 1160; 122 L. Ed. 2d 517 (1993). . . . . . . 40

Marks v. Newcourt Credit Group, Inc., 342 F.3d 444 (6th Cir. 2003). . . . . .27

Middlesex County Ethics Comm. v. Garden State Bar Ass'n,
    457 U.S. 423; 102 S. Ct. 2515; 73 L. Ed. 2d 116 (1982). . . . . . . . 10

Mitchell v. Forsyth,
    472 U.S. 511; 86 L. Ed. 2d 411; 105 S. Ct. 2806 (1985). . . . . . . . 38

New York Times Co. v. Sullivan,
    376 U.S. 254; 11 L. Ed. 2d 686; 84 S. Ct. 710 (1964). . . . . . . . . 32

Nightclubs, Inc. v. City of Paducah, 202 F.3d 884 (6th Cir. 2002). . . . . . . 44

Norfolk & W. R. Co. v. Public Utilities Com.,
    926 F.2d 567 (6th Cir. 1990) . . . . . . . . . . . . . . . . 4, 21, 29

Parker v. Turner, 626 F.2d 1 (6th Cir. 1980). . . . . . . . . . . . . . 6, 8

Patsy v. Bd. of Regents,
    457 U.S. 496; 102 S. Ct. 2557; 73 L. Ed. 2d 172 (1982). . . . 4, 7, 21, 29, 46

Perry v. Sindermann,
    408 U.S. 593; 92 S. Ct. 2694; 33 L.Ed. 2d 570 (1972) . . 8, 26, 31, 43, 44

Rippy v. Hattaway, 270 F.3d 416 (2001). . . . . . . . . . . . 39

Rooker v. Fidelity Trust Co.,
    263 U.S. 413; 68 L. Ed. 362; 44 S. Ct. 149 (1923). . . . . . . . *passim*

Sparks v. Character & Fitness Committee,
    859 F.2d 428 (6th Cir. 1988). . . . . . . . . . . . 6, 9, 25, 39

Sweezy v. New Hampshire,
    354 U.S. 234; 77 S. Ct. 1203; 1 L. Ed. 2d 1311 (1957). . . . . . . . 31

Texas v. Johnson,
    491 U.S. 397; 105 L. Ed. 2d 342; 109 S. Ct. 2533 (1989). . . . . . . 32

Thomas v. Texas State Bd. of Medical Examiners,
    807 F.2d 453 (5th Cir. 1987) . . . . . . . . . . . . . . 4, 29

Thaddeus X v. Blatter,
    175 F.3d 378 (6th Cir. 1999). . . . . . . . . . . . . 43

Virginia v. Black,
    538 U.S. 343; 155 L. Ed. 2d 535; 123 S. Ct. 1536 (2003). . . . . . 17, 32

Wilton v. Seven Falls Co.,
    515 U.S. 277; 115 S. Ct. 2137; 132 L. Ed. 2d 214 (1995). . . . . . . 6, 7

Women's Medical Professional Corp. v. Voinovich,
    130 F.3d 187 (6th Cir. 1997). . . . . . . . . . . . . . 27

Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571 (6th Cir. 2006). . . . 26, 44

Younger v. Harris, 401 U.S. 37; 27 L. Ed. 2d 669; 91 S. Ct. 746 (1971). . . . 10

**STATE CASES**

Griev. Adm'r v. Fieger, 476 Mich. 231; 719 N.W.2d 123 (2006).  .  .  .  19, 20, 30

**FEDERAL RULES OF CIVIL PROCEDURE**

FRCP 12(b)(1) .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  5, 6, 27

FRCP 12(b)(6) .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  5, 6, 27

**FEDERAL STATUTES**

28 U.S.C. § 1331 .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  1

28 U.S.C. § 1343 .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  1

28 U.S.C. § 2106 .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .47

28 U.S.C. § 2201 .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  1

28 U.S.C. § 2202 .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  1

42 U.S.C. § 1983 .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  1

**MICHIGAN STATUTES**

Michigan Compiled Law § 600.934 .  .  .  .  .  .  .  .  .  .  .  .  .  .  11

**MICHIGAN COURT RULES**

MCR 7.304 .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .12

**RULES CONCERNING THE STATE BAR OF MICHIGAN**

Rule 15, §1(5)(c) .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .14, 24, 37

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case presents claims under the First and Fourteenth Amendments concerning Michigan regulations that govern attorney licensing, focusing in particular on the statutory requirement that an applicant must prove good moral character to the "satisfaction" of the licensing authorities.

Appellant believes that oral argument would aid in the determination of these constitutional issues concerning an important regulatory area of Michigan procedure, one that deals with an issue central to the practice of law, namely, how applicants are licensed as attorneys.

Pursuant to Sixth Circuit Rule 34(a), Appellant requests that this Court docket this appeal for oral argument. Appellant believes that oral argument will enable counsel to succinctly place his client's position before the Court in this important First and Fourteenth Amendment case and aid this Court in its decisional process. Oral argument will also afford counsel the opportunity to address any questions that the Court may have concerning the lower court record and the specifics of the parties' respective positions on appeal.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

On September 8, 2006 Appellant Frank J. Lawrence, Jr. (hereinafter "Appellant") filed his Verified Complaint in the district court seeking equitable relief pursuant to 42 U.S.C. §1983, asserting that he was denied a Michigan license to practice law in violation of his protected First Amendment activities. Additionally, Appellant sought damages from three State Bar of Michigan investigators, in their personal capacities, for retaliating against Appellant because they disproved of his exercise of certain federally secured rights. Jurisdiction was based on 28 U.S.C. §§ 1331, 1343(a)(3) and (4) and 2201 and 2202. (R. 1, complaint, Apx. 10). With the Verified Complaint, Appellant filed a motion for a preliminary injunction. (R. 2 and 3, motion and brief for prelim. inj., Apx. 72).

On December 14, 2006, the district court entered an opinion dismissing this action and denying Appellant's motion for preliminary injunction, which was pursuant to Appellees' pre-answer motions to dismiss (R. 50, opinion, Apx. 63). On the same day, the district court entered the final judgment (R. 51, order, Apx. 62). On December 15, 2006, Appellant filed a timely notice of appeal (R. 52, notice of appeal, Apx. 70).

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291 because it stems from the December 14, 2006, final judgment of the district court, which disposed of all pending claims and closed the case.

## STATEMENT OF ISSUES FOR REVIEW

I.  Does the <u>Rooker-Feldman</u>[1] doctrine bar Appellant's civil rights claims in Count I of his Complaint, which consist of an as-applied challenge to a final administrative decision of the Michigan Board of Law Examiners, a state administrative agency that was created by the Michigan Legislature?  Alternatively, assuming <u>arguendo</u> that the <u>Rooker-Feldman</u> doctrine does apply to such administrative decisions, did Appellant's notice of reservation of federal claims and defenses pursuant to <u>England v. Louisiana State Bd. of Medical Examiners</u>, 375 U.S. 411; 84 S. Ct. 461; 11 L. Ed. 2d 440 (1967), which Appellant asserted at the onset of his state administrative proceedings, preclude application of the <u>Rooker-Feldman</u> doctrine in this case?

II.  Are Appellant's as-applied prospective relief claims, which pertain to his future reapplication process, ripe for judicial review and does Appellant have standing to raise those claims, given that he has already been denied admission in a final administrative decision, due to the licensing officials' disapproval of his statements about certain state officials, and

---

[1] <u>See</u> <u>Rooker v. Fidelity Trust Co</u>., 263 U.S. 413, 68 L. Ed. 362, 44 S. Ct. 149 (1923) and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462, 75 L. Ed. 2d 206, 103 S. Ct. 1303 (1983).

Appellant's complaint states that he intends to continue engaging in those same, or substantially similar, activities in the future?

III.  Are individuals who perform "investigative" functions pursuant to Michigan law, and who have no authority to grant or deny an applicant's application to practice law, entitled to absolute immunity from suit? Alternatively, does Appellant's complaint plead sufficient facts and law to overcome a pre-answer motion to dismiss based upon qualified immunity?

IV.  Did the district court abuse its discretion in denying Appellant's motion for a preliminary injunction?

## STATEMENT OF THE CASE

This lawsuit is a sequel to this Court's May 16, 2006 decision in <u>Lawrence v. Chabot</u>, Sixth Circuit Nos. 05-1082, and 05-1397; 2006 U.S. App. LEXIS 12191 (6th Cir. 2006), which found, <u>inter alia</u>, that Appellant Frank J. Lawrence, Jr.'s as-applied federal civil rights claims against Michigan attorney licensing officials were unripe and that Appellant lacked standing. Subsequently, on June 14, 2006, the Michigan Board of Law Examiners denied Appellant a license to practice law in a final administrative decision (R. 1, exhibit to complaint, Apx. 37). During Appellant's state administrative proceedings, he had the burden of proving that his

First Amendment activities should not be the basis for character rejection. (R. 1, complaint, ¶ 37, Apx. 23).

Rather than seek state judicial review of that administrative decision, on September 8, 2006, Appellant filed this lawsuit. Defendant-Appellee John T. Berry is the Executive Director of the State Bar of Michigan (hereinafter "SBM") and Defendant-Appellee Louis A. Smith is the President of the Michigan Board of Law Examiners (hereinafter "BLE"), both of which are charged with the duty of evaluating licensing applicants' "good moral character". These individuals have been sued in their official capacities. (R. 1, complaint, ¶¶ 4, 5, Apx. 11). Defendants-Appellees David Baum, Randy Musbach and Sonal Mithani are investigators for the State Bar of Michigan. They have been sued in their individual capacities. (R. 1, complaint, ¶ 6, Apx. 12).

Appellant's three-count complaint sought three types of relief. In Count I, Appellant challenged the June 14, 2006 administrative decision of the Michigan Board of Law Examiners, as authorized by Patsy v. Bd. of Regents, 457 U.S. 496; 102 S. Ct. 2557; 73 L. Ed. 2d 172 (1982) and Norfolk & W. R. Co. v. Public Utilities Com., 926 F.2d 567, 572 (6th Cir. 1990), which cited Thomas v. Texas State Bd. of Medical Examiners, 807 F.2d 453 (5th Cir. 1987). Specifically, Appellant sought relief on the grounds that the Board's decision was issued in retaliation for his protected First and Fourteenth Amendment rights. Alternatively,

4

Count II of Appellant's complaint sought as-applied prospective relief pertaining to Appellant's future reapplication process.    Specifically, Appellant requested equitable relief enjoining Appellees from again denying Appellant a license to practice law due to his exercise of his federally secured rights.    Finally, Count III of the complaint sought damages from three investigators, who have no ability to approve or deny applications to practice law in Michigan.    Count III is based upon First and Fourteenth Amendments retaliation theories.    Appellant also filed a separate motion for preliminary injunction.

On October 2, 2006, Appellee Louis Smith filed a FRCP 12(b)(1) and (6) motion to dismiss and brief in support  (R. 25 and 27, Smith motion to dismiss and brief, Apx. 107), and on October 10, 2006, he responded to Appellant's motion for preliminary injunction.    (R. 29, Smith response to motion for prelim. inj., Apx. 170).  Appellee Smith argued that his final administrative decision was barred from federal review pursuant to the Rooker-Feldman doctrine, that Appellant's prospective claims were unripe for federal review, that this Court's May 16, 2006 decision collaterally estopped Appellant's claims in this suit, and that the lower court should abstain from this case pursuant to Burford v. Sun Oil Co., 319 U.S. 315, 87 L. Ed. 1424, 63 S. Ct. 1098 (1943).    Appellee Smith reiterated these defenses in his response to Appellant's motion for preliminary injunction, and

further argued that Appellant failed to meet the prerequisites for preliminary injunctive relief.

On October 16, 2006, Appellee John T. Berry responded to Appellant's motion for preliminary injunction (R. 33, Berry response to motion for prelim. inj., Apx. 228), and he filed a motion to dismiss Appellant's complaint pursuant to FRCP 12(b)(1) and (6) (R. 34 and 35, Berry motion to dismiss and brief, Apx. 290).    Appellee Berry advanced the same, or similar, arguments set forth by Appellee Smith. Additionally, Appellee Berry argued that the district court should abstain from adjudicating Appellant's equitable claims pursuant to Wilton v. Seven Falls Co., 515 U.S. 277; 115 S. Ct. 2137; 132 L. Ed. 2d 214 (1995) and Parker v. Turner, 626 F.2d 1 (6th Cir. 1980).

On the same day, Appellees Baum, Musbach and Mithani filed a combined motion to dismiss Appellant's damages claims  (R. 36 and 37, Baum, Musbach and Mithani motion to dismiss and brief, Apx. 369).   They argued that Appellant's damages claims were absolutely barred pursuant to this Court's decision in Sparks v. Character and Fitness Comm. of Ky., 859 F.2d 428 (6th Cir. 1988). Alternatively, Appellees Baum, Musbach and Mithani argued that Appellant's complaint failed to plead sufficient facts and law to overcome a pre-answer motion to dismiss.

On October 24, 2006, Appellant filed his reply to Appellee Smith's response to Appellant's motion for preliminary injunction (R. 38, Lawrence Reply to Smith's response to motion for prelim. inj., Apx. 447) and October 30, 2006, Appellant similarly filed his reply to Appellee Berry's opposition to Appellant's motion. (R. 39, Lawrence reply to Berry's response to motion for prelim. inj., Apx. 458).

On October 30, 2006, Appellant filed his response to Appellee Smith's motion to dismiss (R. 40, Lawrence response to Smith's motion to dismiss, Apx. 476), and on November 17, 2006, Appellant filed his response to Appellee Berry's motion to dismiss (R. 41, Lawrence response to Berry's motion to dismiss, Apx. 479). Appellant argued that the <u>Rooker-Feldman</u> doctrine did not apply here, he was not required to seek state judicial review pursuant to <u>Patsy v. Bd. of Regents</u>, 457 U.S. 496; 102 S. Ct. 2557; 73 L. Ed. 2d 172 (1982), and that his reservation of federal claims and defenses precluded application of the <u>Rooker-Feldman</u> doctrine in this case. Appellant also argued that his prospective claims were ripe and that he had standing because he had already been denied a license in a final administrative decision which disapproved of his engaging in constitutionally protected activities and that he intended to continue engaging in those same activities in the future. Appellant also asserted that he was suffering present adverse affects from the Board's decision to deny him a license, and that it was "a

certainty" that Appellant would reapply for a license to practice law. Appellant further argued that Burford abstention did not apply here because this case does not involve a disputed issue of state law, but rather a conflict between state and federal laws. Finally, Appellant argued that abstention pursuant to Wilton, supra, or Parker, supra, is inapplicable here because there are no ongoing state proceedings and there was no evidence submitted by Appellees that federal adjudication of these issues would affect any cases presently pending in state court.

On November 13, 2006, Appellant responded to Appellees Baum's, Musbach's and Mithani's motion to dismiss (R. 42, Lawrence response to Baum's, Musbach's and Mithani's motion to dismiss, Apx. 515). Appellant argued that this Court's 1988 decision in Sparks is inapplicable here, especially given the Supreme Court's subsequent and clear pronouncements in Buckley v. Fitzsimmons, 509 U.S. 259; 113 S. Ct. 2606; 125 L. Ed. 2d 209 (1995) that state actors who perform "investigative" functions are not entitled to absolute immunity. Alternatively, Appellant argued that he pleaded sufficient facts in his complaint to defeat a pre-answer motion to dismiss and that the law is clearly established that licensing applicants cannot be denied a license to practice law for holding constitutionally protected beliefs. Baird v. State Bar of Arizona, 401 U.S. 1; 91 S. Ct. 702; 27 L. Ed. 2d 639 (1969); Perry v. Sindermann, 408 U.S. 593; 92 S. Ct. 2694; 33 L. Ed. 2d 570 (1972).

8

On November 17, 2006, Appellee Smith filed his reply to Appellant's response to Appellee Smith's motion to dismiss (R. 45, Smith reply to Lawrence response to motion to dismiss, Apx. 527), and on November 21, 2006, Appellee Berry filed his reply brief (R. 48, Berry reply to Lawrence response to motion to dismiss, Apx. 543). On November 27, 2006, Appellees Baum, Musbach and Mithani filed their reply briefs (R. 49, Baum, Musbach and Mithani reply to Lawrence response to motion to dismiss, Apx. 587).

On December 14, 2006, the district court entered its Opinion, (R. 50, opinion, Apx. 63) and Order (R. 51, order, Apx. 62), dismissing this lawsuit. The district court held that Appellant's claims in Count I were barred by the Rooker-Feldman doctrine, and it failed to address Appellant's claims relating to his England reservation. It also said that this Court's May 16, 2006 decision barred any facial challenges to the Michigan licensing system. The district court further found that the prospective claims in Count II of the complaint were unripe and that a favorable decision on the prospective claims would "necessarily imply that the hearing panel's decision was improper and forbidden by the constitution." Finally, the district court dismissed Appellant's damages claims against the State Bar investigators, finding that the claims were barred pursuant to Sparks, supra. Alternatively, the district court found that qualified immunity was appropriate

"since a reasonable officer would not have understood his or her conduct to have been illegal at the time".

On December 15, 2006, Appellant filed his notice of appeal (R. 52, notice of appeal, Apx. 70).

## STATEMENT OF FACTS

A.    Michigan Licensing Framework

An applicant for a license to practice law in Michigan initiates the licensing process by filing an application.  At all times during the application process, an applicant is in control over whether his application remains pending or not.  As such, application proceedings are remedial and/or non-coercive, unlike the criminal proceedings in <u>Younger v. Harris</u>, 401 U.S. 37, 27 L. Ed. 2d 669, 91 S. Ct. 746 (1971), or the disciplinary proceedings in <u>Middlesex County Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423, 102 S. Ct. 2515, 73 L. Ed. 2d 116 (1982). (R. 1, complaint, ¶ 34, Apx. 22).  Additionally, the BLE was created by the Michigan Legislature and it operates pursuant to a grant of legislative authority. The Michigan attorney licensing process is administrative in nature.  (R. 1, complaint, ¶ 5, Apx. 11).

Michigan regulates the practice of law, as with other professions and occupations, by requiring a license as a condition of practice.  An applicant for a law license must meet certain eligibility requirements, which are divided generally

between integrity fitness (evaluated by review of "good moral character") and education fitness (evaluated by written examination of familiarity with standard legal concepts). The SBM and the BLE, through Appellees Berry and Smith, are charged with the responsibility of evaluating applications for admission to the practice of law in the State of Michigan. Appellant's lawsuit is an as-applied challenge to the manner in which Appellees administer the rules governing the assessment of licensing applicants' "good moral character" pursuant to MCL 600.934. (R. 1, complaint, ¶ 7, Apx. 12).

Michigan law gives the BLE final administrative decision-making authority over the assessment of "good moral character," MCL 600.934(1). However, the SBM first conducts an investigation and formulates a recommendation concerning an applicant's character, which is then transmitted to the BLE. (R. 1, complaint, ¶ 8, Apx. 13). The constitutional claims in this lawsuit have been brought because the SBM, through Appellee Berry, and the BLE, through Appellee Smith, use protected speech as a basis for the denial of a government-issued license and as a censorship tool. (R. 1, complaint, ¶¶ 38, 41-43, Apx. 23).

The BLE has admitted that when it and the SBM "make character decisions based on content of an applicant's speech" their "conclusion of unacceptability <u>was not supported by any finding the statements were constitutionally unprotected</u>."

(R. 41, answer in Dubuc case, Apx. 512-514) (emphasis added)[2]. Although there exists a review process wherein an applicant aggrieved by an adverse administrative decision can seek mandamus review in the Michigan Supreme Court pursuant to MCR 7.304(A), the Court's response to such requests is historically a one-sentenced decision, even when constitutional challenges are brought (R. 1, complaint, ¶ 16, Apx. 15).    This is particularly concerning to Appellant since he discovered a confidential internal BLE memo, discussing how applicants had been denied character clearance by the SBM simply because the applicants were not liked. (R. 41, internal memo, Apx. 503).    As further evidence of Appellees' documented practice of using protected First Amendment activities as a basis for character rejection, Appellant discovered the following litigation statements made by the SBM in <u>Dean v. Byerley</u>, 354 F.3d 540 (6th Cir. 2004):

> The bar has had several applicants who exercised free speech in a fashion that contributed to a recommendation of denial.
>                                  * * *
> Although an individual may have a constitutional right to engage in a certain activity under certain circumstances, the activity may constitute a basis on which an applicant is denied admission to the Bar. On occasion, Bar applicants have been denied admission for activity that is lawful, but that reflects poorly on the applicant's suitability to practice law.
>                                  * * *

---

[2] Appellee Berry argued to the district court that Appellant's <u>England</u> reservation of federal claims and defenses "affirmatively prevented" the Appellees from making constitutional rulings.    (R. 35, motion, Apx. 302).    This argument was disingenuous, given that the BLE admitted that constitutional rulings are not made when speech is considered (R. 41, answer in Dubuc case, Apx. 512-514).

> If Mr. Byerley had told plaintiff that he may not be admitted to the Bar because of his picketing, Mr. Byerley would merely have been pointing out to plaintiff a very real possibility.
>
> \* \* \*
>
> Plaintiff may certainly continue to picket in front of the State Bar building, but a reasonable person would recognize that the picketing may reflect adversely on plaintiff's character and fitness to practice law.

(R. 34, exhibit to motion, Apx. 331-332)

It is important to reiterate that the BLE considers applicants' speech in its administrative decision-making, and when rejecting applicants on account of their speech, the BLE does not make "any finding the statements [are] constitutionally unprotected". (R. 41, answer in Dubuc case, Apx. 512-514). **During the state administrative proceedings, the burden is on the applicant to prove that constitutionally protected activities should not warrant character rejection.** (R. 1, complaint, ¶ 37, Apx. 23).

B.    Facts Regarding Appellant's As-Applied Claims

Appellant graduated from an accredited law school in May, 2001, and he passed the July, 2001, Michigan Bar Examination. Appellant's first (withdrawn) application to practice law was addressed in this Court's May 16, 2006 decision. Appellant's second application to practice law is the subject of this lawsuit. Appellant filed his second application on or about August 18, 2004, and in doing so, he asserted a reservation of federal claims and defenses. (R. 1, complaint, ¶ 22, Apx. 18). 12 months later, on August 15, 2005, Appellees Baum, Musbach and

Mithani were selected by the SBM to conduct an informal interview and investigation of Appellant. The investigative non-adjudicatory duties of Appellees Baum, Musbach and Mithani are set forth in Michigan Supreme Court Rule 15, §(1)(5)(c). (R. 34, SBM rules, Apx. 322)

Appellant's complaint alleges that he has had an extremely contentious relationship with SBM staff and that, inter alia, Appellant was responsible for publicly exposing that the SBM's executive director, Appellee John Berry, committed plagiarism in one of Appellee Berry's articles on the character and fitness process (R. 1, complaint, ¶ 21, Apx. 17), something that the SBM and Appellee Berry have never denied. Appellant's complaint alleged numerous other events that were a motivating factor for Appellee Baum's, Musbach's and Mithani's retaliatory motives and intentions. (R. 1, complaint, ¶ 21, Apx. 17).

On August 19, 2005, Appellees Baum, Musbach and Mithani issued a "report and recommendation" based on their investigation. (R. 1, complaint, ¶ 23, Apx.18). It was an unfavorable character recommendation based, inter alia, on Appellant's criticism of the Michigan state court system (R. 1, complaint, ¶ 24, 25, 64, Apx. 19). For example, Appellees Baum, Musbach and Mithani stated in their investigative recommendation:

> Applicant made it clear that, at least in part because of the litigation, he has little respect – and indeed considerable disdain – for the state court system. For example, he explained that it became his goal early on in the litigation to do whatever he could

to get the matter into Federal court. <u>He explained that it is really the Federal courts that are the guardians of the constitution, and that, in contrast, the state court system fails adequately to protect individuals' constitutional rights. We are concerned about providing a law license to someone who, even before he has handled his first case as a member of the bar, has effectively written off such a huge component of the justice system.</u>

(R. 1, complaint, ¶ 24, Apx. 18) (emphasis added)

After receiving the SBM investigative report, Appellant publicly criticized Appellees Baum and Mithani. Specifically, Appellant sent a letter to the Board of Directors of Community Legal Resources (the former employer of Appellee Mithani) criticizing her for violating Appellant's constitutional rights. The complete text of Appellant's letter to Community Legal Resources is embodied in the BLE's opinion (R. 1, exhibit to complaint, Apx. 46). Also, Appellant contacted the University of Michigan Student Government Office to make arrangements for Appellant to meet with students (Appellee Baum is employed at the University of Michigan). Specifically, Appellant desired to share his experience with students who might be interested in learning about how Appellee Baum abused Appellant's constitutional rights.

After Appellees Baum, Musbach and Mithani forwarded their investigative recommendation to Appellee Smith and the BLE, it was brought to the BLE's attention that Appellant had been publicly criticizing Appellees Baum and Mithani. This information infuriated the BLE, which conducted an administrative hearing

concerning Appellant's character and fitness on April 20, 2006. Before and during Appellant's BLE hearing, the members of the BLE were reminded that Appellant continued to reserve his federal claims and defenses for adjudication in a federal forum (R. 1, complaint, ¶ 29, Apx. 20). On June 14, 2006, the BLE and Appellee Smith denied Appellant's request for a license to practice law in a final administrative decision. However, the BLE rejected all of Appellee Baum's, Musbach's and Mithani's investigative recommendations and the BLE came up with its own independent reason for character rejection. (R. 1, complaint, ¶ 30, Apx. 20). Specifically, the BLE issued a written opinion withholding Appellant's character approval due to Appellant's speech related activities between the time of Appellant's SBM district investigative committee hearing on August 15, 2005 and the BLE hearing on April 20, 2006, namely, on account of Appellant's public statements against Appellees Baum and Mithani (R. 1, exhibit to complaint, Apx. 37). Importantly, **Appellant was not denied for making false or untruthful statements**. Both the SBM's and BLE's decisions were made without regard to whether Appellant's First Amendment activities were protected by state law or not. (R. 1, complaint, ¶¶ 32, 42, Apx. 21).

Appellees' district court briefs repeatedly discussed how Appellant's then attorney, Hugh Davis, said he found Appellant's speech to be "personally reprehensible", while omitting any mention of Mr. Davis' explanation to the BLE

that in his professional judgment Appellant's conduct could not be the basis for character rejection. (R. 1, exhibit to complaint, Apx. 54). This is consistent with Supreme Court Justice Sandra Day O'Connor's remark that "the hallmark of the protection of free speech is to allow free trade in ideas--even ideas that the overwhelming majority of people might find distasteful or discomforting." Virginia v. Black, 538 U.S. 343, 358, 155 L. Ed. 2d 535, 123 S. Ct. 1536 (2003). Mr. Davis' point should have been well taken by the BLE, especially since all of its members are lawyers: free speech that Mr. Davis personally thinks is "reprehensible" cannot constitutionally be the basis for character rejection. "[O]ne man's vulgarity is another's lyric." Cohen v. California, 403 U.S. 15, 25; 91 S. Ct. 1780; 29 L. Ed. 2d 284 (1971).

Appellant continues to engage in the same conduct that resulted in the BLE's decision to deny him character approval. (R. 1, complaint, ¶ 33, Apx. 21). For example, following receipt of the BLE's June 14, 2006 opinion, Appellant picketed the law office of BLE member Gerald Marcinkoski with a large sign that stated "I do not recommend attorney Gerald Marcinkoski". (R. 1, complaint, ¶ 33, Apx. 21). Also, Appellant sent individual letters to the members of the Civil Rights Commission criticizing BLE member Linda V. Parker for the manner in which she handled Appellant's application, the letter being similar in form to the one Appellant sent about Appellee Mithani (Linda V. Parker works for the Civil

Rights Commission) (R. 1, complaint, ¶ 33, Apx. 21).    Appellant also intends to picket the law office of Appellee Smith. (R. 1, complaint, ¶ 33, Apx. 21).  These activities are analogous to those the BLE used to deny Appellant character clearance and most assuredly will result in future denials unless a federal court grants the prospective relief requested by Appellant.  Therefore, Appellant alleged, the need for prospective relief concerning future character rejection is not speculative or hypothetical because he is suffering from present adverse effects of the BLE's decision (he cannot qualify for a license to practice law until he ceases his protected First Amendment activities). (R. 1, complaint, ¶ 61, Apx. 29). Appellant's complaint alleges that he is suffering a "chilling effect" and that he has "an actual and well-founded fear" of suffering future deprivations of constitutional dimension. (R. 1, complaint, ¶¶ 33, 61, Apx. 21).

C.    Appellees Do Not Make "Judicial" Decisions

In its May 16, 2006 decision, this Court relied upon (and cited) Magistrate Joseph Scoville's Report and Recommendation in Lawrence v. Chabot, 2003 U.S. Dist. LEXIS 17894 (W.D. Mich. 2003) at *56, which held that "the Sixth Circuit's decision in Fieger governs the present case" since licensing applicants can bring constitutional challenges in state administrative proceedings. See, Lawrence, 2003 U.S. Dist. LEXIS 17894 at * 56, citing Fieger v. Thomas, 74 F.3d 740 (6th Cir. 1996) ("Plaintiff's challenge to the adequacy of the right of judicial review is

foreclosed by a decision of the Sixth Circuit Court of Appeals rendered in a closely

analogous case. <u>Fieger v. Thomas</u>"). In <u>Fieger</u>, the Sixth Circuit stated:

> Fieger emphatically contends that the procedure summarized
> above does not afford him an opportunity to raise
> constitutional challenges. He maintains that the hearing panel
> and the Board cannot consider constitutional challenges to the
> Rules of Professional Conduct.
>
>         \* \* \*
>
> In contrast, counsel for the Commission has stated in her briefs
> and oral argument before the district court and the appellate
> panel that the hearing panel and the Board are not precluded
> from hearing Fieger's constitutional claims.

<u>Fieger</u>, 74 F.3d at 747-748

In this Court's 1996 decision in <u>Fieger</u>, it held that since Mr. Fieger could

bring constitutional challenges before the administrative disciplinary board, Mr.

Fieger's claims of inadequate review were unpersuasive. <u>Id</u>. at 748.

**However, on July 31, 2006, things changed**. Ten years after this Court's

decision in <u>Fieger</u> (that constitutional challenges could be brought before the

Board), and two months after this Court's May 16, 2006 decision in Appellant's

case, the Michigan Supreme Court issued a decision proving that Mr. Fieger was

correct all along:

> A disciplinary proceeding in Michigan commences upon the filing of
> a formal complaint and is heard before a panel of three lawyers.
> Appeals are then taken to the ADB. The ADB is an administrative
> body, comprised of nine individuals appointed by this Court, three of
> whom are not attorneys. While the ADB, like all other governmental
> entities, must operate in accord with the Constitution, for example,
> on questions such as compelled witness self-incrimination, <u>it does not</u>

possess the power to hold unconstitutional rules of professional conduct that have been enacted by this Court. As we said in Wikman v Novi, 413 Mich. 617, 646-647; 322 N.W.2d 103 (1982), administrative agencies generally do not possess the power to declare statutes unconstitutional because this is a core element of the "judicial power" and does not belong to an agency that is not exercising this constitutional power. The power of judicial review is one that belongs exclusively to the judicial branch of our government.

Should any attorney appearing before the ADB believe a rule itself to be unconstitutional, such as in this case, resort must be made to an appeal to this Court, and, if we concur in this assessment, it is our responsibility to declare such rule unconstitutional.

Griev. Adm'r v. Fieger, 476 Mich. 231, 253-254;719 N.W.2d 123 (2006) (emphasis added)

Because Appellees do not possess such declaratory authority, their administrative decisions cannot be considered "judicial" in nature and the only opportunity for state judicial review is through a mandamus action that is functionally equivalent to a "leave to appeal" process.    (R. 1, complaint, ¶ 16, Apx. 15).  See also, Dubuc v. Mich. Bd. of Law Examiners, 342 F.3d 610, 613 (6th Cir. 2003) ("Dubuc sought leave to appeal the Board's decision to the Michigan Supreme Court, which declined to grant review." emphasis added)

## SUMMARY OF THE ARGUMENT

In this case, there has been no "state court judgment", only an administrative decision by Appellee Smith.  Because Appellant has not presented his claims to any Michigan court, this case is unlike Feldman, and the Rooker-Feldman doctrine

cannot apply. The district court erred in failing to follow the pronouncements of the Supreme Court in its recent decision in <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284; 125 S. Ct. 1517; 161 L. Ed. 2d 454 (2005), namely, that the doctrine is "confined" to litigants "complaining of injuries caused by state-**court** judgments" (emphasis added). The relief requested in Count I of Appellant's complaint is authorized by <u>Patsy v. Board of Regents</u>, 457 U.S. 496, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982) and this Circuit's decision in <u>Norfolk & W. R. Co. v. Public Utilities Com.</u>, 926 F.2d 567, 572 (6th Cir. 1990), which expressly rejected a requirement of exhausting administrative remedies before suing under 42 U.S.C. §1983.

Alternatively, the district court erred in failing to address Appellant's argument that his <u>England</u> reservation of his federal claims precluded application of the <u>Rooker-Feldman</u> doctrine. A valid reservation precludes application of the <u>Rooker-Feldman</u> doctrine. <u>DLX, Inc. v. Kentucky</u>, 381 F.3d 511, 523 fn.9 (6th Cir. 2004); <u>Barnes v. McDowell</u>, 848 F.2d 725, 732 (6th Cir. 1988). Therefore, even if this Court were inclined to apply the <u>Rooker-Feldman</u> doctrine to administrative decisions, it should not be applied here because of Appellant's reservation.

The district court also erred by dismissing Appellant's prospective relief claims. A favorable decision granting prospective relief would not run afoul of the <u>Rooker-Feldman</u> doctrine and "necessarily imply that the hearing panel's decision

was improper and forbidden by the constitution". <u>See</u>, <u>Dubuc v. Mich. Bd. of Law Examiners</u>, 342 F.3d 610, 618 (6th Cir. 2003) (this Court approved of a prospective relief action whereby an applicant "has explicitly not challenged the denial of his [prior] application" and "no outcome in [the] lawsuit could or would reverse any prior state court judgment"). The district court failed to recognize that while the relief granted under <u>Ex parte Young</u>, 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908), may only be prospective, "proof for the claim necessitating relief can be based on historical facts, and most often will be". <u>Entergy Ark., Inc. v. Nebraska</u>, 210 F.3d 887, 898 (8th Cir. 2000); <u>Edelman v. Jordan</u>, 415 U.S. 651, 39, Ed. 2d 662, 94 S. Ct. 1347 (1974).

The district court erred by finding that Appellant lacked standing and his prospective relief claims were unripe by basing its decision on <u>Grendell v. Ohio Supreme Ct.</u>, 252 F.3d 828 (6th Cir. 2001). Unlike the situation in <u>Grendell</u>, the lower court record contains sworn evidence that "it is a certainty" that Appellant will reapply for a law license (R. 4, affidavit, ¶ 5, Apx. 93), that Appellant has engaged and will continue to engage <u>in the same</u> conduct that resulted in his first denial (R. 1, complaint, ¶¶ 33, 61 and exhibit to complaint, Apx. 21, 59), that Appellant must immediately change his conduct to be eligible for a law license in the future (R. 1, exhibit to complaint, Apx. 55), and that a future denial for the same conduct would be a violation of the First Amendment (R. 1, complaint, ¶¶ 38,

51, 64-65, Apx. 23). An allegation that a plaintiff wishes to engage in prohibited activity is generally sufficient to confer standing. See, e.g., Kolender v. Lawson, 461 U.S. 352, 355 n.3, 75 L. Ed. 2d 903, 103 S. Ct. 1855 (1983). In this case, unlike in Grendell where "the sanctions imposed by the Ohio Supreme Court have already been perfected", 252 F.3d at 832, Appellant is suffering continuing, present adverse effects: he cannot qualify for a license to practice law in Michigan until he ceases protected First Amendment activities of which Appellees disapprove. The facts and circumstances of this case are far more analogous to Fieger v. Ferry, ___F.3d ___ (6th Cir. 2006); 2006 U.S. App. LEXIS 31745 (6th Cir. 2006), where this Court recently held that Fieger had standing to bring his claims because it was "likely, rather than speculative, that Fieger will again face the recusal issue that he has faced in past cases...".

Ripeness most often is addressed in situations where "litigants seek to enjoin the enforcement of statutes, regulations, or policies that have not yet been enforced against them." Ammex, Inc. v. Cox, 351 F.3d 697, 706 (6th Cir. 2003) (emphasis added). Here, the injury has already occurred and without federal relief, it will most assuredly occur again. This Court has before it a situation where factual developments have fully evolved and legal issues are now the focus of this litigation. The lower court's ripeness decision, if upheld, effectively precludes typical federal question jurisdiction by relegating aggrieved applicants to an

illusory post-administrative review process that does not mandate, and is extremely unlikely to lead to, any actual judicial review. The ripeness doctrine should not be applied in a manner which effectively eliminates federal trial court jurisdiction of significant federal questions that involve government censorship and implicate injury to First Amendment rights, constitutional injuries that the law regards as irreparable. Prospective judicial consideration, by a federal district court, is the only effective (and truly meaningful) remedy for the censorship of such fragile, and cherished, constitutional interests.

The district court erred by finding that Appellees Baum, Musbach and Mithani are entitled to absolute immunity, when in fact, Appellees merely perform investigative functions pursuant to Michigan Law, and they have no authority to approve or deny a license. (R. 1, complaint, ¶ 63, Apx. 30). These Appellees are not adjudicative decision-makers. They "investigate" and conduct an "informal interview" with licensing applicants. (R. 1, complaint, ¶¶ 6, 63, Apx. 30, and Rule 15, §1(5)(c) of the Michigan Supreme Court Rules Governing the State Bar of Michigan). These individuals "perform[] the investigative functions normally performed by a detective or police officer" such as "searching for clues and corroboration that might give [them] probable cause" to recommend proceedings before actual adjudicative decision-makers. Buckley v. Fitzsimmons, 509 U.S. 259, 273, 276-78, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993). Common law did not

provide absolute immunity for investigators who conduct "informal interviews" and who merely make investigative recommendations. Appellees Baum, Musbach and Mithani do not engage in functions that are "functionally comparable to that of a judge." <u>Butz v. Economou</u>, 438 U.S. 478, 513, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978). (internal quotation marks and citations omitted). The district court erred by relying upon <u>Sparks v. Character & Fitness Comm. of Ky.</u>, 859 F.2d 428 (6th Cir. 1988) because <u>Sparks</u> pre-dated the Supreme Court's clear and subsequent pronouncements in <u>Buckley</u>, <u>supra</u>, that investigative functions are not provided by absolute immunity.

The district court erred by stating that Appellant "has failed to cite any factual circumstances from which one could conclude that the judicial acts in question were the product of an improper bias or motive". A fair reading of the Verified Complaint reveals completely the opposite. (R. 1, complaint, ¶¶ 21, 67-68 Apx. 17). Appellant's factual allegations, accepted as true, could result in a finding that Appellees' actions were not objectively reasonable and that they violated Appellant's clearly established right to hold the belief "that it is really the Federal courts that are the guardians of the constitution, and that, in contrast, the state court system fails adequately to protect individuals' constitutional rights" (R. 1, complaint, ¶ 24, Apx. 18). Appellant had a clearly established right not to have his political beliefs used against him during administrative proceedings. In <u>Perry</u>

v. Sindermann, 408 U.S. 593, 597; 33 L. Ed. 2d 570; 92 S. Ct. 2694 (1972), the

Supreme Court of the United States stated:

> For at least a quarter-century, this Court has made clear that even
> though a person has no "right" to a valuable governmental benefit and
> even though the government may deny him the benefit for any
> number of reasons, there are some reasons upon which the
> government may not rely. It may not deny a benefit to a person on a
> basis that infringes his constitutionally protected interests --
> especially, his interest in freedom of speech. For if the government
> could deny a benefit to a person because of his constitutionally
> protected speech or associations, his exercise of those freedoms would
> in effect be penalized and inhibited. This would allow the government
> to "produce a result which [it] could not command directly." *Speiser v.
> Randall*, 357 U.S. 513, 526. Such interference with constitutional
> rights is impermissible.

See also, Baird v. State Bar of Arizona, 401 U.S. 1; 91 S. Ct. 702; 27 L. Ed. 2d 639
(1971) and separate opinions by Black, Douglas, Brennan, and Marshall, JJ. (under
the First Amendment, views and beliefs are immune from Bar Association
inquisitions designed to lay a foundation for barring an applicant from the practice
of law.)

Finally, the district court erred by refusing to grant Appellant's motion for

preliminary injunctive relief.    In determining whether to a grant preliminary

injunction, a district court is required to consider: (1) the plaintiff's likelihood of

success on the merits; (2) whether the plaintiff may suffer irreparable harm absent

the injunction; (3) whether granting the injunction will cause substantial harm to

others; and (4) the impact of an injunction upon the public interest. Yolton v. El

Paso Tenn. Pipeline Co., 435 F.3d 571, 578 (6th Cir. 2006).    All four of these

elements were met in this case. Any injury to First Amendment rights constitutes

irreparable loss, <u>Elrod v Burns</u>, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed. 2d 547 (1976), and this Court should immediately grant Appellant's request for an injunction.

## <u>STANDARD OF REVIEW</u>

Because this case involves "constitutional facts," the highest standard of review must be provided to the matter <u>sub judice</u>.    <u>See</u>, <u>Women's Medical Professional Corp. v. Voinovich</u>, 130 F.3d 187, 192 (6th Cir. 1997) ("[a]n appellate court is to conduct an independent review of the record when constitutional facts are at issue."); <u>Bose Corp. v. Consumers Union of United States, Inc.</u>, 466 U.S. 485, 505, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984).

The district court's dismissal of Appellant's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed <u>de novo</u>. <u>Marks v. Newcourt Credit Group, Inc.</u>, 342 F.3d 444, 451 (6th Cir. 2003). This Court should accept all the Appellant's factual allegations as true and construe the complaint in the light most favorable to Appellant. <u>See Id</u>. at 451-52. This Court should not affirm the district court's order dismissing Appellant's complaint "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [his] claim[s] which would entitle [him] to relief." <u>Id</u>. at 452 (internal quotation marks and citation omitted).

# ARGUMENT

I. **THE <u>ROOKER-FELDMAN</u> DOCTRINE DOES NOT BAR APPELLANT'S CIVIL RIGHTS CLAIMS IN COUNT I OF HIS COMPLAINT, WHICH CONSIST OF AN AS-APPLIED CHALLENGE TO A FINAL ADMINISTRATIVE DECISION OF THE MICHIGAN BOARD OF LAW EXAMINERS, A STATE ADMINISTRATIVE AGENCY THAT WAS CREATED BY THE MICHIGAN LEGISLATURE.**

**ALTERNATIVELY, ASSUMING <u>ARGUENDO</u> THAT THE <u>ROOKER-FELDMAN</u> DOCTRINE DOES APPLY TO SUCH ADMINISTRATIVE DECISIONS, APPELLANT'S NOTICE OF RESERVATION OF FEDERAL CLAIMS AND DEFENSES PURSUANT TO <u>England v. Louisiana State Bd. of Medical Examiners</u>, 375 U.S. 411; 84 S. Ct. 461; 11 L. Ed. 2d 440 (1967), WHICH APPELLANT ASSERTED AT THE ONSET OF HIS STATE ADMINISTRATIVE PROCEEDINGS, PRECLUDES APPLICATION OF THE <u>ROOKER-FELDMAN</u> DOCTRINE IN THIS CASE.**

The BLE is an administrative agency that performs non-coercive administrative functions. (R. 1, complaint, ¶¶ 5, 17, Apx. 11). Appellee Smith admitted in his lower court brief that "the Board of Law Examiners is a state administrative agency" (R. 27, motion to dismiss, Apx. 113), and the district court's opinion also refers to the Appellees' agencies as "state administrative agencies". The <u>Rooker-Feldman</u> doctrine, does not apply to administrative decisions, only state court judgments. On March 30, 2005, because "the doctrine ha[d] sometimes been construed to extend far beyond the contours of the <u>Rooker</u>

and Feldman cases" the Supreme Court of the United States clarified how the

doctrine should be applied:

> The Rooker- Feldman doctrine, we hold today, is confined to
> cases of the kind from which the doctrine acquired its name:
> cases brought by state-**court** losers complaining of injuries
> caused by state-**court judgments** rendered before the district
> court proceedings commenced and inviting district court review
> and rejection of those **judgments**.

Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284; 125 S. Ct.
1517; 161 L. Ed. 2d 454 (2005) (double emphasis added)

Appellant has not presented his claims to any Michigan court. Accordingly,

this case is unlike Feldman, and the Rooker-Feldman doctrine cannot apply. Also,

Appellant was not required to seek state judicial review. This is supported by

Patsy v. Board of Regents, 457 U.S. 496, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982)

and this Circuit's decision in Norfolk & W. R. Co. v. Public Utilities Com., 926

F.2d 567, 572 (6th Cir. 1990), which cited Thomas v. Texas State Bd. of Medical

Examiners, 807 F.2d 453 (5th Cir. 1987).

Assuming arguendo that the Rooker-Feldman doctrine is applicable to

administrative decisions, the doctrine would still be inapplicable here because of

Appellant's reservation of federal claims and defenses. (R. 1, complaint, ¶¶ 22,

29, 46, Apx. 18). A valid reservation precludes application of the Rooker-

Feldman doctrine. DLX, Inc. v. Kentucky, 381 F.3d 511, 523 fn.9 (6th Cir. 2004);

Barnes v. McDowell, 848 F.2d 725, 732 (6th Cir. 1988).

The decision of the BLE cannot be characterized as "judicial" in nature, given the Michigan Supreme Court's recent decision in <u>Griev. Adm'r v. Fieger</u>, 476 Mich. 231, 253-254; 719 N.W.2d 123 (2006), which disallows licensing applicants to raise constitutional challenges to licensing rules during state administrative proceedings.    The district court erred by applying the <u>Rooker-Feldman</u> doctrine to Count I of Appellant's complaint.

**II.    APPELLANT'S AS-APPLIED PROSPECTIVE RELIEF CLAIMS, WHICH PERTAIN TO HIS FUTURE REAPPLICATION PROCESS, ARE RIPE FOR JUDICIAL REVIEW AND APPELLANT HAS STANDING TO RAISE THOSE CLAIMS, GIVEN THAT HE HAS ALREADY BEEN DENIED ADMISSION IN A FINAL ADMINISTRATIVE DECISION, DUE TO THE LICENSING OFFICIALS' DISAPPROVAL OF HIS STATEMENTS ABOUT CERTAIN STATE OFFICIALS, AND APPELLANT'S COMPLAINT STATES THAT HE INTENDS TO CONTINUE ENGAGING IN THOSE SAME, OR SUBSTANTIALLY SIMILAR, ACTIVITIES IN THE FUTURE.**

Appellant's free speech related activities used by Appellee Smith to deny Appellant a law license were openly and honesty held views and could not be used as a basis to deny a government-issued license.  This issue was squarely addressed in <u>Konigsberg v. State Bar of California</u>, 353 U.S. 252, 268-269; 77 S. Ct. 722; 1 L. Ed. 2d 810 (1957), wherein a bar applicant wrote a series of editorials for a local newspaper where he "severely criticized ... this Court's decisions in <u>Dennis</u> and

other cases." Id. at 268.  In addressing the bar applicant's "severe" criticism of

public officials, our nation's highest Court stated:

> We do not believe that an inference of bad moral character can
> rationally be drawn from these editorials. Because of the very nature
> of our democracy such expressions of political views must be
> permitted. Citizens have a right under our constitutional system to
> criticize government officials and agencies. Courts are not, and should
> not be, immune to such criticism. Government censorship can no
> more be reconciled with our national constitutional standard of
> freedom of speech and press when done in the guise of determining
> "moral character," than if it should be attempted directly.

Id. at 269.

Therefore, if Konigsberg's "severe" public criticism of the Supreme Court

could not be considered evidence of bad moral character, there is no possible way

that Appellee Smith's administrative decision is in compliance with constitutional

standards.  In Sweezy v. New Hampshire, 354 U.S. 234; 77 S. Ct. 1203; 1 L. Ed.

2d 1311 (1957), the Supreme Court stated:

> History has amply proved the virtue of political activity by minority,
> dissident groups, who innumerable times have been in the vanguard
> of democratic thought and whose programs were ultimately
> accepted. Mere unorthodoxy or dissent from the prevailing mores is
> not to be condemned. The absence of such voices would be a
> symptom of grave illness in our society.

Id. at 251

Further, because Appellee Smith uses protected speech as a basis for the

denial of a government-issued license, his practices violate the rule of Perry v.

Sindermann, 408 U.S. 593, 597; 33 L. Ed. 2d 570; 92 S. Ct. 2694 (1972), as

articulated above. Appellant had every right to engage in the conduct that resulted in his BLE denial. That same continuing conduct will most assuredly result in the denial of his next application, since he has been warned to cease his criticism of the State Bar of Michigan. The "freedom to criticize public officials <u>and expose their wrongdoing</u> is at the core of First Amendment values, <u>even if the conduct is motivated by personal pique or resentment.</u>" <u>Barrett v. Harrington</u>, 130 F.3d 246, 263 (6th Cir. 1997) (emphasis added). In the district court, Appellee Berry repeatedly referred to Appellant's speech as an "attack" on Appellees Mithani and Baum, but the Supreme Court has said "debate on public issues should be uninhibited, robust and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials". <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 270, 11 L. Ed. 2d 686 , 84 S. Ct. 710 (1964). In <u>Texas v. Johnson</u>, 491 U.S. 397, 414, 105 L. Ed. 2d 342, 109 S. Ct. 2533 (1989), Justice Brennan wrote for the Court, "if there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Justice O'Connor has remarked "the hallmark of the protection of free speech is to allow free trade in ideas--even ideas that the overwhelming majority of people might find distasteful or discomforting." <u>Virginia v. Black</u>, 538 U.S. 343, 358, 155 L. Ed. 2d 535, 123 S. Ct. 1536 (2003).

The district court was incorrect in holding that a favorable decision granting prospective relief would "necessarily imply that the hearing panel's decision was improper and forbidden by the constitution". This is contrary to this Court's decision in <u>Dubuc v. Mich. Bd. of Law Examiners,</u> 342 F.3d 610, 618 (6th Cir. 2003), where this Court approved of a similar prospective relief action. The district court also attempted to distinguish this case from <u>Dubuc</u> by stating that it is dissimilar to Dubuc's specific rule challenge. This is incorrect. In <u>Dubuc,</u> this Court remanded the case to consider issuing "... declaratory and injunctive relief allowing him to reapply immediately for admission to the Bar <u>and prohibiting</u> <u>defendants from considering First Amendment activity when considering</u> <u>applications for admission to the Bar.</u>" (emphasis added). There is nothing about the <u>Rooker-Feldman</u> doctrine that precludes Appellant's prospective claims, especially since "proof for the claim necessitating relief can be based on historical facts, and most often will be". <u>Entergy Ark., Inc. v. Nebraska,</u> 210 F.3d 887, 898 (8th Cir. 2000); <u>Edelman v. Jordan,</u> 415 U.S. 651, 39, Ed. 2d 662, 94 S. Ct. 1347 (1974).

The lower court misapplied the ripeness and standing doctrines to this matter. The lower court's record contains sworn evidence that "it is a certainty" that Appellant will reapply for a law license (R. 4, affidavit, ¶ 5, Apx. 93), that Appellant has engaged and will continue to engage <u>in the same</u> conduct that

resulted in his first denial (R. 1, complaint, ¶¶ 33, 61 and exhibit to complaint, Apx. 21, 59), that Appellant must immediately change his conduct to be eligible for a law license in the future (R. 1, exhibit to complaint, Apx. 37), and that a future denial for the same conduct would be a violation of the First Amendment (R. 1, complaint, ¶¶ 38, 51, 64-65, Apx. 23). Appellant is suffering continuing, present adverse effects because Appellees are unwilling to provide him a license to practice law until Appellant ceases protected First Amendment activities – activities that Appellant refuses to cease.

If this Court finds that it is proper to delay review, the hardship to Appellant would be manifest. He graduated from law school and passed the Bar Exam six years ago. Appellant has been denied a license to practice law in Michigan since that time. The (former) president of the Michigan Board of Law Examiners, William Rheaume, specifically noted in his concurring June 2006 opinion that with regard to Appellant's first application, the Bar admission process was used in an attempt to get Appellant to dismiss litigation involving (former) State Bar President Thomas Ryan. (R. 1, exhibit to complaint, Apx. 56). When the State Bar called Thomas Ryan as a witness to discuss this topic, Board President Rheaume found Mr. Ryan's testimony to be incredulous. Id. Also, Appellant has alleged a chilling effect on his First Amendment rights, which the law deems as an

"irreparable" injury. <u>Elrod v. Burns</u>, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed. 2d 547 (1976). An irreparable injury constitutes hardship.

Appellees alleged in the lower court that any hardship is <u>de minimus</u> because Appellant need only wait until June, 2007 to reapply. The fact that the BLE applied a shortened period of ineligibility does not affect, in any way, the hardship involved because any future application would be subject to the same improper scrutiny of protected rights that is at the core of this lawsuit. <u>See</u>, <u>Fieger v. Ferry</u>, ___F.3d ___ (6th Cir. 2006); 2006 U.S. App. LEXIS 31745 (6th Cir. 2006). Appellee Smith and the BLE knew that their reasons for character rejection were illegitimate and unconstitutional, but a message had to be sent to Appellant that public criticism of those involved in the admission process is not allowed. Further, it will most likely be years before Appellant's application reaches the BLE. When Appellant reapplied for a law license in August 2004, the SBM used delay as a retaliation tool. It took the SBM 12 months to refer his application to Appellees Baum, Mithani and Musbach for an investigative informal interview. Once the SBM sent Appellees Baum's, Mithani's and Musbach's investigative report to the BLE, it took Appellee Smith an additional eight months to hold a hearing, and another two months to issue its decision. This 22-month delay was on top of the 19-month delay (that was the subject of Appellant's prior damages action discussed in this Court's May 16, 2006 decision). If this Court delays

review, it will be granting permission to Appellees to continue improperly using delay as a form of retaliation. "The Supreme Court . . . has found hardship when enforcement of a statute or regulation is inevitable and the sole impediment to ripeness is simply a delay before the proceedings commence." <u>Kardules v. City of Columbus</u>, 95 F.3d 1335, 1344 (6th Cir. 1996).

**III. INDIVIDUALS WHO PERFORM "INVESTIGATIVE" FUNCTIONS PURSUANT TO MICHIGAN LAW, AND WHO HAVE NO AUTHORITY TO APPROVE OR DENY AN APPLICANT'S APPLICATION TO PRACTICE LAW, ARE NOT ENTITLED TO ABSOLUTE IMMUNITY FROM SUIT.**

**ALTERNATIVELY, APPELLANT'S COMPLAINT PLEADED SUFFICIENT FACTS AND LAW TO OVERCOME A PRE-ANSWER MOTION TO DISMISS BASED UPON QUALIFIED IMMUNITY.**

Absolute immunity from civil liability is appropriate only in exceptional circumstances. <u>Butz v. Economou</u>, 438 U.S. 478, 507, 57 L. Ed. 2d 895, 98 S. Ct. 2894 (1978). The Supreme Court has held that courts should be "quite sparing" in endorsing absolute immunity, refuse to expand it beyond what is justified, and require government officials to bear the burden of establishing that such immunity is appropriate on a case-by-case basis. <u>Id.</u> The "<u>presumption is that qualified rather than absolute immunity is sufficient</u> to protect government officials in the exercise of their duties." <u>Burns v. Reed</u>, 500 U.S. 478, 486-87, 114 L. Ed. 2d 547, 111 S. Ct. 1934 (1991) (emphasis added).

The district court failed to articulate the specific functions that Appellees Baum, Musbach and Mithani perform, which are specified in Michigan Supreme Court Rule 15, §(1)(5)(c). Had it done so, it would have been clear that Appellees are non-adjudicative investigators with no power to grant or deny applications.

Appellees argue that because they perform duties at the behest of the Michigan Supreme Court, then it necessarily follows that they perform "judicial" functions. After the SBM was successful with this same argument in front of Judge David McKeague (in Appellant's prior action), the appealed result in this Court was different: the SBM defendants were only awarded qualified immunity. Lawrence v. Chabot, 2006 U.S. App. LEXIS 12191 at ** 21 (6th Cir. 2006). During oral argument on February 2, 2006, when the two SBM employees argued to Sixth Circuit Judge John Rogers that they perform judicial functions, and thus, are entitled to absolute immunity, Judge Rogers responded "…it's the Court telling them to do it rather than the executive branch telling them to do it. But that's a formal organizational chart difference, that isn't a function of what-you-do difference." (R. 39, response brief, Apx. 461).

Judge Rogers' statement was an accurate representation of the law. Courts must take a functional approach in determining whether absolute immunity is appropriate. See, Forrester v. White, 484 U.S. 219, 224, 98 L. Ed. 2d 555, 108 S. Ct. 538 (1988); Cleavinger v. Saxner, 474 U.S. 193, 201, 88 L. Ed. 2d 507, 106 S.

Ct. 496 (1985). Title or identity is an insufficient basis upon which to confer absolute immunity; instead, whether absolute immunity ought to be afforded must be determined by the nature of the responsibilities of the official in question. See Forrester, 484 U.S. at 224 ("We examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted"); Cleavinger, 474 U.S. at 201.    Here, Appellees are not adjudicative decision-makers, but rather, investigators who, at most, have the power to issue a *recommendation* to an administrative body (the SBM Standing Committee on Character and Fitness) that, at most, only has the power to issue a *second recommendation* to the Michigan Board of Law Examiners.    The interviews conducted by Appellees lack key elements of a true adversarial proceeding, such as a neutral *decision maker* and formal evidentiary rules.  Appellees are not in the business of dispute resolution, or of authoritatively adjudicating private rights.  Therefore, they are not the types of state actors whom the Supreme Court of the United States has found to be entitled to absolute immunity.

Appellant noted in the district court that Appellees' motion to dismiss completely failed to address the three factors that guide a court in making a determination of whether absolute immunity should be awarded, as outlined in Mitchell v. Forsyth, 472 U.S. 511, 521-23, 86 L. Ed. 2d 411, 105 S. Ct. 2806 (1985) (R. 42, Lawrence response brief, Apx. 518).  Therefore, there was no way

that they could have met their burden. Also, the district court erred by relying upon Sparks v. Character & Fitness Comm. of Ky., 859 F.2d 428 (6th Cir. 1988) because Sparks pre-dated the Supreme Court's clear and subsequent pronouncements in Buckley, supra, that investigative functions are not covered by absolute immunity. Spark's applicability to investigative functions, if any, was nullified by that 1993 Supreme Court decision.

The district court also cited this Circuit's decision in Rippy v. Hattaway, 270 F.3d 416 (2001) in support of its decision to grant Appellees absolute immunity. There are two distinct reasons why Rippy is inapplicable here.

First, unlike the defendants in Rippy, who made child welfare recommendations *directly to the court*, the Appellees in this case are far removed from any Court or phase of any *judicial proceedings*. Rather, Appellees make investigative recommendations to a volunteer standing committee of a Bar association (SBM Standing Committee on Character and Fitness) that only at most has the power to make a second recommendation to the Michigan Board of Law Examiners (an administrative agency created by the Michigan legislature) (R. 42, response, Apx. 516). Therefore, unlike Rippy, Appellees here are insulated, by two administrative layers, from any "judicial" officers or proceedings.

Second, Rippy acknowledged "The investigation of a social worker that precedes the filing of a complaint or petition is not necessarily a judicial act

covered by absolute immunity" and it cited <u>Achterhof v. Selvaggio</u>, 886 F.2d 826, 830 (6th Cir. 1989) for this proposition. The important distinction between <u>Rippy</u> and the present case is that Appellees here perform *statutory non-coercive and non-adversarial functions*, which removes this from the types of situations where absolute immunity was found to be appropriate. In <u>Achterhof</u>, this Court said at 866 F.2d at 830:

> Despite the possibility that criminal prosecution might have resulted from Selvaggio's investigation, his decision to "open a case" was not entitled to absolute immunity. This decision was only investigatory or administrative in nature, not prosecutorial, judicial or otherwise intimately related to the judicial process. <u>Selvaggio did not initiate any court action in the role of a prosecutor, nor did he sit as a judge in an adversary proceeding. His work was investigatory. Indeed, it was investigatory work of the most ordinary kind since it was mandated by the statute.</u> (emphasis added)

Similarly, pursuant to Michigan court rules, all Michigan attorney licensing applicants are subjected to an investigation, either by SBM staff or by district committee investigators. Here, Appellees performed statutorily mandated *investigative* functions similar to those described in <u>Achterhof</u>, <u>supra</u>, and they are not entitled to absolute immunity from suit.

<u>Qualified Immunity.</u>    Although a federal civil rights plaintiff need not anticipate a qualified immunity defense to state a claim, <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 165-68, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993), Appellant's Complaint did so, and Appellant

articulated why a potential defense of qualified immunity would fail. (R. 1, complaint, ¶¶ 64-68, Apx. 31-32). Appellant's factual allegations, accepted as true, could result in a finding that Appellees' actions were not objectively reasonable and that they violated Appellant's clearly established right to hold the belief "that it is really the Federal courts that are the guardians of the constitution, and that, in contrast, the state court system fails adequately to protect individuals' constitutional rights" (R. 1, complaint, ¶ 24, Apx. 18).

Appellees' lower court arguments that they were justified in their conduct is irrelevant to the issue of qualified immunity in this case because: (1) Appellant alleged that Appellees' conduct was retaliatory; and (2) "an act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." Bloch v. Ribar, 156 F.3d 673, 681-682 (6th Cir. 1998). Also, Appellees disingenuously asserted that Appellant did not have a clearly established right to be free from retaliation on account of his beliefs about the state court system. However, the SBM mistakenly overlooked the fact that in the Dubuc case, it already admitted that it was aware of this clearly established right:

> **Admission cannot be denied because the applicant** is a member of a disfavored political association or a strong advocate of controversial positions, or more directly, because he or she exercises the right to redress grievances through litigation or **is critical of the judicial system or individual judges**.

[R. 39, Berry's response in Dubuc case, Apx. 473-474] (emphasis added)

However, in an attempt to disavow its prior litigation statements, the SBM claimed to the district court below *in this case* that reasonable state officials would *not* have known that they were violating Appellant's constitutional rights.

When determining whether a right is "clearly established," a court looks "first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." Daugherty v. Campbell, 935 F.2d 780, 784 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). As the Supreme Court explained, however, "this is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Id. (citations omitted). The Appellees contended in the lower court that it was not "clearly established" at the time of Appellant's investigative interview that First Amendment activities were off-limits during a character and fitness evaluation. Such an argument, however, misstates the relevant inquiry for the Court in this case. Rather, Appellant's damages claim rested upon a retaliation theory. The right to hold the belief, free from such retaliation, that the state courts of Michigan do not adequately protect

42

constitutional rights was clearly established at the time of Appellant's investigative interview. See Perry v. Sindermann, 408 U.S. 593, 597; 33 L. Ed. 2d 570; 92 S. Ct. 2694 (1972); Baird v. State Bar of Arizona, 401 U.S. 1; 91 S. Ct. 702; 27 L. Ed. 2d 639 (1969); Thaddeus-X v. Blatter, 175 F.3d 378, 394-95 (6th Cir. 1999) (en banc).

Finally, the lower court's decision that Appellant failed to allege enough facts to overcome qualified immunity is untrue and Appellant urges this Court to review the allegations in his Verified Complaint, particularly those that pertain to Appellees motives for retaliation. (R. 1, complaint, ¶¶ 21, 64, 67, Apx. 17, 23). Since the SBM has already admitted that an applicant cannot be denied a license for being "critical of the judicial system or individual judges", (R. 39, response in Dubuc case, Apx. 473-474), one can only infer a retaliatory motive by the Appellees, who obviously knew better.

## IV. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR A PRELIMINARY INJUNCTION.

This Court reviews the grant or denial of a preliminary injunction "for an abuse of discretion, but questions of law are reviewed de novo." Detroit Free Press v. Ashcroft, 303 F.3d 681, 685 (6th Cir. 2002). In determining whether to grant preliminary injunctive relief, a district court is required to consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer

irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest. Yolton v. El Paso Tenn. Pipeline Co., 435 F.3d 571, 578 (6th Cir. 2006).

In First Amendment cases "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits" because "the issues of the public interest and harm to the respective parties largely depend on the constitutionality" of the state action. Nightclubs, Inc. v. City of Paducah, 202 F.3d 884, 888 (6th Cir. 2002). Here, the district court should have found that the likelihood of Appellant's success is high because it is beyond any reasonable dispute that the BLE's decision is an affront of protected First Amendment rights, Perry, supra, Konigsberg, supra, and Baird v. State Bar of Arizona, 401 U.S. 1, 8; 91 S. Ct. 702; 27 L. Ed. 2d 639 (1971). Once the Supreme Court of the United States held that "severe" criticism of the Court itself does not authorize character rejection, Konigsberg, 353 U.S. at 269, there can be no doubt that Appellee Smith's denial of Appellant's character approval, due to Appellant's verbal and public criticisms of state licensing officials, is wrong and unconstitutional. Further, Appellee Smith's decision has had a chilling effect on Appellant and it would deter a person of ordinary firmness from engaging in federally secured

freedoms.  Any injury to First Amendment rights constitutes irreparable loss. Elrod v Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed. 2d 547 (1976).

It is expected that a federal court will enforce federal law upon state actors who have injured constitutional rights.  In this respect, no harm will come to the public if injunctive relief is granted in this case because the public has an interest in being protected from state actors who fail to abide by the U.S. Constitution. Indeed, a state administrative decision that punishes a person for stating *his opinion* about constitutional infirmities within state government is dangerously self-serving.  There is no conceivable harm that would result if this Court grants the relief requested herein.

In Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati, 363 F.3d 427, 436 (6th Cir. 2004), the Sixth Circuit noted, "the public interest is served by preventing the violation of constitutional rights".  Therefore, if this Court determines that Appellee Smith's and Berry's practices violate the Constitution, then the public would be well-served if this Court granted the injunctive relief requested.

The lower court concluded that equitable relief would not be appropriate because "These are not circumstances concerning which an injunction could be meaningfully crafted or enforced."  This is highly inaccurate.  An injunction could be easily crafted which prohibits Appellees from placing the burden of proof on

applicants to show that their First Amendment activities do not merit character rejection. It would be equally simple to require Appellees to cease considering an applicant's <u>protected</u> First Amendment activities when evaluating his or her moral character. Any enforcement of such an injunction would be enforceable in the same manner as any other injunction issued by a federal court.

The Supreme Court has made it clear:

> The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights -- to protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial.

<u>Patsy v. Board of Regents</u>, 457 U.S. 496, 503, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982). This Court should exercise its authority to restrain Appellees' unconstitutional action and interpose itself as a guardian in this case.

## CONCLUSION AND RELIEF REQUESTED

**WHEREFORE**, Appellant prays that this Court grant the following relief:

1.    reverse the district court's decision to dismiss Appellant's claims;

2.    reverse the district court's denial of Appellant's request for a preliminary injunction;

3.    grant an injunction before remanding this case to the district court, that would prohibit the Appellees' future use of protected First Amendment activities as a basis for the assessment of the moral

character and fitness of applicants and as a basis for denying character certification to attorney applicants;

4.  in the alternative, issue an injunction wherein Appellees will be required to conduct their decision-making in a way that ensures that they will assess whether an applicant's speech-related acts are substantially protected by law, and, when they evaluate such a matter, the Appellees should have the burden in showing that the speech is unprotected;

5.  remand this case back to the district court for further proceedings; and

6.  grant any other relief that is just and appropriate under the circumstances. 28 U.S.C. §2106.

Dated:  January 22, 2007                    Respectfully submitted:

_Dennis Dubuc/FR_
_____
Dennis B. Dubuc (P67316)
Counsel for Appellant
Essex Park Law Office, P.C.
12618 10 Mile Rd
South Lyon, MI  48178
(248) 486-5508

## CERTIFICATE OF COMPLIANCE

I certify that this final brief is in compliance with FRAP 32(a)(7)(C) and it

contains 11,094 words (14 point, Times New Roman font, MS Word application),

excluding the Table of Authorities, Designation of the Contents of the Joint

Appendix, if any, and this Certificate.


Dated:  January 22, 2007                    Respectfully submitted:


                                            _Dennis Dubuc /ESR_
                                            Dennis B. Dubuc (P67316)
                                            Counsel for Appellant
                                            Essex Park Law Office, P.C.
                                            12618 10 Mile Rd
                                            South Lyon, MI  48178
                                            (248) 486-5508

# CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of January, 2007, pursuant to Fed. R. App. P. 25, I have caused this Final Brief of Appellant and this Certificate of Service to be served by Federal Express, postage prepaid, on the following:

John R. Oostema (P26891)
Richard Kraus (P27553)
Smith, Haughey, Rice & Roegge, P.C.
250 Monroe Avenue, NW, Suite 200
Grand Rapids, MI  49503
(616) 774-8000

Denise C. Barton (P41535)
Assistant Attorney General
Public Employment, Elections
& Tort Division
P.O. Box 30736
Lansing, MI  48909-8236
(517) 373-6434

Dated:  January 22, 2007

Respectfully submitted:

Dennis Dubuc/FR
Dennis B. Dubuc (P67316)
Counsel for Appellant
Essex Park Law Office, P.C.
12618 10 Mile Rd
South Lyon, MI  48178
(248) 486-5508

49

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Frank J. Lawrence, Jr.          88888 | Mark S. Carlin, Alan H. Kent, and Three Unknown Investigators |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Oakland Cty., MI
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Frank J. Lawrence, Jr.
Pro Se
941 Westview, Bloomfield Hills, MI  48304
(248) 722-2560

CASE NUMBER   1:07CV00288

JUDGE: Royce C. Lamberth

DECK TYPE: Civil Rights (non-employm

DATE STAMP: 02/⬤7/2007

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZEN: FOR PLAINTIFF

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* |
|---|---|---|

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

2

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment (criteria: race, gender/sex, national origin, disability age, religion, retaliation)** | ☐ **895 Freedom of Information Act** ☐ **890 Other Statutory Actions (if Privacy Act)** | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |
| | *(If pro se, select this deck)* | *(If pro se, select this deck)* | |

| ○ **K. Labor/ERISA (non-employment)** | ◎ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** ☐ **720 Labor/Mgmt. Relations** ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** ☐ **740 Labor Railway Act** ☐ **790 Other Labor Litigation** ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** ☐ **443 Housing/Accommodations** ☐ **444 Welfare** ☒ **440 Other Civil Rights** ☐ **445 American w/Disabilities-Employment** ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** ☐ **120 Marine** ☐ **130 Miller Act** ☐ **140 Negotiable Instrument** ☐ **150 Recovery of Overpayment & Enforcement of Judgment** ☐ **153 Recovery of Overpayment of Veteran's Benefits** ☐ **160 Stockholder's Suits** ☐ **190 Other Contracts** ☐ **195 Contract Product Liability** ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

◎ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

42 U.S.C. §1983. This is a case seeking to enforce rights protected by the First, Fifth and Fourteenth Amendments to the U.S. Constitution.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** Not Available **JURY DEMAND:** | Check YES only if demanded in complaint YES ☐ NO ☒ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** N.F. | (See instruction) | YES ☐ | NO ☒ | If yes, please complete related case form. |
|---|---|---|---|---|

**DATE** 2/5/06    **SIGNATURE OF ATTORNEY OF RECORD** _Frank Lumma, pro se_

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.